Thomas and Marie AIELLO; Dominick and Diane Cerretani; Michael and Debra Josiah; Robert and Christine McGinnis; Kristine McGroary; Timothy and Deborah Odietus; Philip and Lynn Paul; Philip J. Paul, Jr. and Lisa Paul; Denise Ann Vogt; Glen and Dianne Adone; Steven and Kathleen Colasuonno, individually and on behalf of Steven and Michelle Donisi, minors; Don and Kathleen Devereaux; Teresa Rehberg; Louis and Patricia Donisi, individually and on behalf of Steven and Michelle Donisi, minors; Anthony and Janice Genco; Karen Gibaldi; Salvatore Gibaldi; Gina Gibaldi; Joseph C. Sr., and Mary E. Lauricella, individually and on behalf of James and Lori Lauricella, minors; Harold and Susan Liles;

Erik Liles; Cory and Linda McKibbin, individually and on behalf of Thomas and Jonathan McKibbin, minors; Andrew and Lorraine Magyar; Andrew and Alyssa Marvel; Frederick and Pamela Portz; Eric and Evelyn Pust; Tara M. Rizzo; Ronald and Linda M. Rizzo, individually and on behalf of Kim L. Rizzo, minor; Angelo C. and Joyce L. Saladino; and Daniel and Janet Weaver, Plaintiffs,

v.

TOWN OF BROOKHAVEN, Defendant.

No. 94 CNF 2622 FB.

United States District Court,
E.D. New York.

March 15, 2001.

Robert N. Zausmer, Meyer, Suozzi, English & Klein, P.C., Mineola, NY, Bernard L. Burton, Burton & Associates, P.C., Melville, NY, for Plaintiffs.

Annette Eaderesto, Town Attorney, Brookhaven Department of Law, Medford, NY, Charles D. Cunningham, Snitnow & Cunningham, LLP, New York City, for Defendant.

## DECISION, ORDER AND CERTIFICATION

BLOCK, District Judge.

### TABLE OF CONTENTS

INTRODUCTION ................................................................84

FINDINGS OF FACT ...........................................................85
    I.   The Old Town Landfill ...............................................85
   II.  The Pond and Creek.................................................86
  III.  The Phase I Report .................................................88
  IV.  The Phase II Report................................................90
   V.  The Court's Expert..................................................94
       A.   The Sinking Plume ...........................................95
       B.   The Chemical Contamination of the Pond and Creek Attributable to
           the Landfill ...............................................96

            1.  Ammonia–N .................................................97
            2.  Iron ......................................................97
            3.  Manganese ................................................99
            4.  Other Chemicals ..........................................99
        C.  Elimination of Other Sources ................................100

DISCUSSION ..........................................................100
    I.  Resource Conservation and Recovery Act .........................100
        A.  Statutory and Regulatory Framework ..........................100
        B.  Parties' Contentions ........................................104
        C.  Subject Matter Jurisdiction .................................105
        D.  Application of Statute .......................................110
            1.  Has Solid Waste Been Disposed of at the Landfill? ......110
            2.  Has the Town Contributed to the Past or Present Disposal of the
                Solid Waste? ...........................................111
            3.  Has the Pond and Creek Been Contaminated by the Leachate
                Plume? .................................................113
            4.  Does the Contamination of the Pond and Creek Present an
                Imminent and Substantial Endangerment to Health or the
                Environment? ...........................................114
    II. Clean Water Act ...............................................117
        A.  Statutory Framework ........................................117
        B.  Application of Statute ......................................118
            1.  Has There Been a Discharge of a Pollutant from a Point Source? .....118
            2.  Was the Discharge Into Navigable Waters? ...............119
            3.  Can the Town, As a Past Polluter, Be Held Liable for the
                Ongoing Nature of the Discharge? .......................120

CONCLUSION ..........................................................121
CERTIFICATION PURSUANT TO 28 U.S.C. § 1292(b) .......................121
ADDENDUM A (Map of Former Holtsville Landfill Monitoring Well Locations) .........123
ADDENDUM B (Color-reproduced copy of photograph of Motts Pond) ..................124

## INTRODUCTION

Plaintiffs, a group of individuals residing in the immediate vicinity of the former Holtsville Landfill (the "landfill") located in the southwest portion of the Town of Brookhaven, New York ("Town"), have brought this action against the Town alleging violations of two federal environmental statutes, the Resource Conservation and Recovery Act of 1976 ("RCRA") and the Federal Water Pollution Control Act of 1972 ("Clean Water Act" or "CWA"). Their claims are based upon their contention that the landfill has contaminated a creek and pond abutting or in close proximity to their homes. They also allege certain New York State statutory and common law claims as a consequence of such contamination. Plaintiffs seek remediation, compensatory damages, civil penalties and attorney's fees.

The parties stipulated that the trial would be bifurcated. The first phase would resolve liability under the federal claims. If the Town prevailed, plaintiffs agreed to discontinue their state law claims. If plaintiffs were successful, the second phase would resolve the state law claims, in addition to addressing remedies for the federal violations.[1] The federal liability claims thereafter were tried before

---

1. The stipulation also provided that "[t]he procedure for determining the damages, if any, to be paid to any plaintiff who prevails in Phase Two on any State law claim will be resolved by consultation among the parties and the Court before the commencement of the Phase Two trial." Stipulation and Order, Jan. 9, 1997.

the Court without a jury.[2] Pursuant to Federal Rule of Civil Procedure 52(a), the following constitutes the Court's findings of fact and conclusions of law. As gleaned therefrom, the Town is not liable under the Clean Water Act, but is responsible under RCRA for contaminating the creek and pond because it contributed to the disposal of solid waste which presents an imminent and substantial endangerment to the environment. The case will accordingly proceed to the second phase.

## FINDINGS OF FACT

### I. The Old Town Landfill

Although the record does not precisely trace the history of the landfill, it appears that for some indeterminate period prior to 1937 the property was owned by New York State and used as an open dump for burning garbage. *See* Ex. 27 at 4–1.[3] Thereafter, the Town began acquiring the property and it became the proverbial town dump. In 1968 it was converted by the New York State Environmental Facilities Corporation ("EFC") to a forty-acre sanitary landfill with septage lagoons. *See id.;* Ex. 33 at 4–1. In 1974 the landfill was closed by EFC and transformed into Town recreational facilities. *See* Ex. 27 at 4–1, 4–5.[4]

James Heil ("Heil"), EFC's project manager at the time of the closing of the landfill, testified for the Town that the landfill was closed by first covering it with "sand or material" and then applying "an-

other 18 inches to two feet" of "loam," which was "sort of a tight soil," as a "final cover." Tr. at 875.[5] It was not lined. *See* Ex. 33 at 4–1. Moreover, it "d[id] not contain a leachate collection system." *Id.*

Although the Town did not maintain records documenting the types or quantities of materials it allowed to be deposited in the landfill, it was "always easily accessible for disposal of industrial waste." Ex. 27 at 4–1. Heil, who prior to becoming the project manager for EFC had inspected the landfill during the late 1960s when employed by the Suffolk County Department of Health Services ("SCDHS"), candidly told the Court that "[t]here [was] no restriction as to what could be dumped into the landfill." Tr. at 902. As he stated, it had been "an open landfill for years and anybody [could] dump anything in it." Tr. at 902–03. Given his personal familiarity with the dump, Heil characterized its contents as "municipal solid waste," *id.,* meaning "solid waste garbage, refuse, yard waste, construction demolition debris, sludges, originating from residential and commercial establishments within a municipality." Tr. at 890. This was confirmed by James Lapienski ("Lapienski"), a former employee of the Town who was employed as a bulldozer operator at the landfill in the mid–1960s. He observed at that time household garbage, televisions, old boats, trees, automotive parts, batteries, tires and sludge being dumped, most of which was brought to the landfill by mu-

---

**2.** The trial took place during March 1998 and May 1999. Post-trial briefings were completed in January 2000.

**3.** "Ex." refers to trial exhibits.

**4.** There appears to be some confusion in the record as to the actual size of the landfill. *Compare* Ex. 27 at 4–1 ("[t]he actual landfill is 40 acres in size") *with* Ex. 33 at 4–1 ("approximately 75 acres of the site was operated as a landfill from the mid–1930's to 1974

when it was closed"). The record is also unclear as to the precise nature of the Town's relationship with EFC and the Town's control over the landfill subsequent to 1968. *See* Ex. 27 at 1–1 (stating that the landfill was "[u]nder the ownership of the [EFC] from 1968–1974").

**5.** "Tr." refers to the trial testimony during March 1998.

nicipal and private carting firms. *See* Tr. of Lapienski Dep. at 8–14.[6]

## II. The Pond and Creek

Approximately 2,500 feet south of the landfill, and about 1,000 feet south of Woodside Avenue, lies Motts Pond. *See* Ex. I–1.[7] It was characterized by the Town's witness, David Tonjes ("Tonjes"), a Town engineer since 1992, as basically a "still body of water." Tr. at 685. Tonjes explained that although there is an "intermittent stream" feeding into the pond from the north, this stream had "very little flow," Tr. at 686, and that "Motts Pond appears to be fed by groundwater" coming from "the shallow groundwater system surrounding the pond." Tr. at 573. Michael Veraldi ("Veraldi"), the plaintiffs' expert witness, opined that groundwater migrates "underneath the landfill and does not surface to become a surface body of water until it gets to Motts Pond." Tr. at 236. Tonjes described the pond as "perhaps 300 feet long, approximately fifty feet wide." Tr. at 573. Although Tonjes placed its depth at one location as "approximately one foot," Tr. at 573, Veraldi reported from his review of certain records that the pond "can be as deep as nine feet in the center." Tr. at 235. Veraldi explained that there is a large "well defined stream continually running from th[e]

pond," Tr. at 686, sometimes referred to as Motts Creek, leading to Canaan Lake, a large navigable body of water. *See* Tr. at 42, 50. The creek is a tributary of Canaan Lake. *See* Ex. 27 at 4–6 ("[t]he closest surface water downgradient of the Holtsville Landfill is an unnamed tributary of [C]anaan Lake"); Ex. 33 at 3–20 ("[t]he most prominent surface water feature in the study is an unnamed creek which originates in the southeast corner of the former landfill, flows in a southeasterly direction and discharges into Canaan Lake").[8] Motts Creek was described by one of the plaintiffs, Harold Liles ("Liles"), who has lived by it since 1974, as being fifteen-to-seventeen-feet wide, about two-to-three feet deep, and running about 1,500 feet from the pond to the mouth of Canaan Lake. *See* Tr. at 423–24, 428–29.

Liles characterized the creek at the time he bought his home in 1974 as a pristine "babbling brook," Tr. at 421, and as "clear as glass." Tr. at 425. Rowboats, canoes and paddle boats went up and down the creek. *See* Tr. at 425. However, it started turning grey in the mid–1980s, and thereafter turned "pure orange." Tr. at 426. He described the mouth of Canaan Lake as grayish and a wildlife "dead zone." Tr. at 426. Another plaintiff, Linda McKibbin, who has lived near the creek

---

6. Lapienski's testimony was rendered at a deposition, and was accepted into evidence. *See* Tr. at 937.

7. These distances were calculated by the Court according to the scale contained on Exhibit I–1, a map entitled "Former Holtsville Landfill Monitoring Well Locations." A copy of Exhibit I–1 is attached as Addendum A. *See also* Ex. 27 at 4–6 ("[w]hen the water table is high, the headwaters of this tributary stream originate in the vicinity of the southeastern corner of the facility, and otherwise originate approximately 2,500 ft south of the landfill").

8. Canaan Lake flows into Great Patchogue Lake, which flows into the Patchogue River and empties into Patchogue Bay (part of the Great South Bay) and the Atlantic Ocean. *See* U.S. Geological Survey, U.S. Dep't of Interior, Planimetric Maps, New York—Suffolk Co., Patchogue Quadrangle & Sayville Quadrangle (1975); Suffolk County Dep't of Planning, Existing Land Use Map (1962). The Court takes judicial notice of these public records. *See Papasan v. Allain*, 478 U.S. 265, 268 n. 1, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991) (citing, *inter alia*, Fed. R.Evid.201); *United States v. Gonzalez*, 442 F.2d 698, 708 n. 11 (2d Cir.1970).

since 1987, rendered comparable testimony, describing the pond and creek as "murky" as of that year, and by 1994 looking "like tomato soup before you whisked it." Tr. at 489–90. Plaintiff Thomas Aiello ("Aiello"), who lived next to the pond beginning in 1967, testified that it looked at that time "like a country brook," supporting "[a]ll kinds" of wildlife, "catfish, rabbits, ducks, even raccoons, black snakes." Tr. at 372–73. He believed that the color of the pond started to turn a "golden rusty" color during the mid–1970s, but became extremely visible by 1993. Tr. at 380; see Tr. at 377, 391–92. Veraldi described the condition of Motts Pond and Motts Creek as of 1996, when he was retained by plaintiffs, as ·a "toxic soup," devoid of any life. Tr. at 43–44. An aerial photograph of the pond and part of the creek taken sometime after February 1996, see Tr. 39–40, poignantly depicts that they had turned a deep orange hue. See Ex. 95.[9] Tonjes described the color of the pond and creek as "unlike any I have ever seen elsewhere." Tr. at 549.

There is evidence in the record of culverts [10] on the north and south ends of the pond. Veraldi testified that a culvert on the south end of the pond was "located directly on the outflow of the pond," Tr. at 302, and "flows from the southern part of the creek in a southeasterly direction." Tr. at 329. Plaintiff Christine McGinnis ("McGinnis") confirmed that there is "some kind of outflow pipe in the: southern part of the pond ... some type of a pipe or a culvert," describing it both as "a little cement thing" and as "a metal tube that's under the ground." Tr. at 463–64. She explained that water coming from the

pond "goes into the pipe, and then you can go to the other side of the property where it comes out of the tube." Tr. at 464–65. McGinnis described the water as being the same color as the water in the pond. Tr. at 465.

In respect to the intermittent stream on the north side of the pond, plaintiff Philip Paul testified as follows:

> [T]here's two culvert pipes that go underneath Woodside Avenue which feed this stream which feed my pond ... and there's the two culvert pipes there and the spring that feeds the culvert pipes, and there's orange, it's the same orange sediments and contamination coming into the culvert pipes flowing underneath and coming out on the south side of Woodside Avenue.

Tr. at 942.

During a site inspection by the Court on March 26, 1998, in the presence of counsel, the Court observed a culvert pipe underneath Woodside Avenue. It did not, however, examine whether there were culvert pipes at the south end of the pond, but has no reason to disbelieve McGinnis's testimony, which stands uncontroverted. The Court also observed during this site inspection a number of modest homes juxtaposed to the pond, compatible with plaintiffs' apparent working-class income levels. For example, plaintiff Joseph Lauricella is a retired Long Island Railroad conductor, see Tr. at 437, plaintiff Michael Josiah is a technical service manager for a recycling company, see Tr. at 406, and Aiello had retired as an assistant director and coordinator of federally funded youth programs for the Suffolk County Labor Department. See Tr. at 371–72.[11]

9. A color-reproduced copy of this photograph is attached as Addendum B.

10. A "culvert" is "[a] sewer or drain running under a road or embankment." Webster's II

New Riverside University Dictionary 335 (1988).

11. Subsequent to trial, the Court was advised that Aiello had passed away. See Ltr. of Bernard L. Burton, Esq., Sept. 8, 1998.

### III. The Phase I Report

A report prepared for the New York State Department of Environmental Conservation ("DEC") by EA Science and Technology ("EA Science"), partially entitled "Engineering Investigations at Inactive Hazardous Waste Sites, Phase 1 Investigation, Holtsville Landfill," dated June 1987, traces the history to that date of governmental interventions subsequent to the closing of the landfill. *See* Ex. 27 at 4–2 to 4–3. Initially, in 1979 the SCDHS sampled "the stream downgradient of the landfill" because of "concerns over red staining in the stream." *Id.* at 4–2. The sample results are unknown, and nothing further was done until 1982 when some dead fish were found in Canaan Lake. *Id.* Consequently, in that year, the DEC surveyed the lake and "noted that the stream had a high specific conductance and dense populations of iron-fixing bacteria." *Id.* As a result of this survey the DEC determined that "the Town had caused the discharge of leachate into a stream without a valid [State Pollutant Discharge Elimination System ("SPDES")] permit," and in August 1983 issued a Consent Order requiring the Town "to study the leachate problem." *Id.* at 4–3. The Consent Order contained a Compliance Schedule requiring that by October 1, 1983 the Town "shall have submitted an engineering report on the leachate plume and remediation." Ex. 12, Schedule A; Ex. 27 at App. 1. 1–12, Schedule A. In August 1986, the DEC met with the Town and was told that "no engineering report had been produced." Ex. 27 at 4–3. Presumably as a consequence of the Town's recalcitrance, EA Science was commissioned by the DEC to do a Phase I investigation.

The goal of the Phase I investigation was to

(1) obtain available records on the site history from the state, federal, county, and local agencies; (2) obtain information on site topography, geology, local surface water and ground-water use, previous contamination assessments, and local demographics; (3) interview site owners, operators, and other groups or individuals knowledgeable of site operations; (4) conduct a site inspection to observe current conditions, and (5) prepare a Phase I report.

*Id.* at 2–1. The Phase I report was to include "a Hazard Ranking Score ["HRS"] and an assessment of the available information." *Id.*

EA Science issued its Phase I report in June 1987. *See* Ex. 27 ("Phase I report"). It noted that sometime in 1982 the Town had installed three groundwater monitoring well clusters down-gradient of the landfill, consisting of a total of seven wells. *See id.* at 4–4 & App. 1.1—17. In 1983, it installed three additional clusters, up-gradient of the landfill, comprising nine wells. *Id.* at 4–4 & App. 1.1–18. The clusters contained shallow, intermediate and deep wells, ranging from nine- to 100–feet deep. *Id.* Analyzing data from these wells, EA Science concluded that "[c]hemical analysis performed on the water samples consistently confirm a release to ground water of iron, manganese, ammonia, and magnesium," *id.* at 4–11, and that "[t]he detected concentrations of these contaminants in samples from the downgradient wells were at least 10 times greater than the detected concentrations in samples collected from the background (upgradient) wells." *Id.* at p. 2 of section entitled "Documentation Records For Hazard Ranking System" (following p. 5–1). EA Science also reported that several samples of surface water collected at the mouth of the pond by SCDHS personnel in 1985 "contained

iron." [12] *Id.* at 4–13. The SCDHS observed at that time "that the stream banks were stained and the water was murky orange." *Id.* at 4–11.

As required by the Phase I investigation, EA Science was to arrive at an HRS from all the available data. Veraldi explained that "[t]he hazardous ranking score is a numerical number that is assigned to a landfill to determine its potential hazard condition to the environment and/or health of the surrounding community," Tr. at 17, and if the HRS was "above 28.5" the site would qualify "for listing as a hazardous waste site." Tr. at 28–29. EA Science arrived at an HRS of 42.24. *See* Ex. 27, Figures 1–10 (following p. 5–1).

Given this high HRS, and its assessment of available information, EA Science made a preliminary determination that the landfill was a potential hazardous waste site. *See id.* section (unnumbered) entitled "Potential Hazardous Waste Site Preliminary Assessment." It drew on a report by the Environmental Protection Agency ("EPA") that characterized the nature of the hazard as "[p]otential ground-water and surface water contamination," and the description of the substances possibly responsible for the contamination as "[h]ousehold and commercial garbage, septic sludges from residential, commercial, and industrial sources." *Id.* at 2 (unnumbered). EA Science concluded that "[t]he existing data are adequate to confirm a release of contaminants (iron and manganese) from the Holtsville Landfill to the ground water," but that "surface water quality data are reportedly inconclusive and there have been no documented hazardous wastes released." Ex. 27 at 6–1. Accordingly, it made the following recommendation:

It is recommended that the next step involve a complete characterization of the ground-water contamination (including potential organic compounds) and the horizontal and vertical extent of this contamination. Also, further evaluation of potential surface water contamination should be performed. This is beyond the scope of a Phase II program. Therefore, performance of a Phase II investigation is not recommended for this site.

*Id.* at 1–2.

In 1984, shortly after the Town entered into the 1983 Consent Order, it hired Dvirka & Bartilucci ("D & B") as its consulting engineering firm. *See* Tr. at 772–73. The Town had engaged D & B in an "open-ended" contract to perform services on an as-needed basis, Tr. at 773; *see* Tr. at 772, 775, and D & B considered the Town to be a "good ongoing client." Tr. at 799. Notwithstanding the Phase I report's recommendation, D & B apparently prevailed upon the DEC to permit it to conduct a Phase II investigation, and a further Consent Order, to this effect, was entered into between the Town and DEC in 1987. *See* Ex. J; Tr. at 534–35.

In a memorandum dated May 11, 1988, sent by Thomas Maher ("Maher"), D & B's project director for the Phase II study, to the Commissioner of the Town's Department of Waste Management, *see* Ex. 34; Tr. at 728, 786–87, Maher had informed the Town:

Because of the documented release of contaminants to the groundwater (ten times above background for some of the inorganic chemicals monitored) the site has an HRS score of [4]2.24, well above the threshold of [28.5] to be considered a potential hazard by DEC. Because of

---

12. The full record reads in that respect "contained iron (13–18 ppm)." Ex. 27 at 4–13. The Court assumes that "ppm" refers to

"parts per million," but the record does not explain the nature or the precise significance of this reading.

the documented release of contaminants, the consultant who prepared the Phase I Investigation Report (Final, June 1987) recommends a complete characterization of contaminants, and definition of the horizontal and vertical extent of the plume (RI/FS) which is beyond the scope of a Phase II Investigation.

Tr. at 788. "RI/FS" is the abbreviation for "remedial investigation/feasibility study." See Tr. at 781.

Maher testified under cross-examination by plaintiffs' counsel that he conferred with the Town regarding whether to conduct a Phase II investigation or to undertake the RI/FS recommended by EA Science, and that "cost was a consideration and was discussed with the Town." Tr. at 783; see Tr. at 788. Maher estimated the cost for a Phase II study to be approximately $250,000, versus $750,000 to $850,000 for an RI/FS. Tr. at 784, 798–99. He further explained that although the Town could possibly receive seventy five percent reimbursement from New York State for an RI/FS study, the Town would not be eligible for such funds unless it accepted the designation of the landfill as a potential hazardous waste site, which it was unwilling to do because of the "stigma." Tr. at 793; see Tr. at 789–793.

In contrast to the recommended RI/FS, Maher explained that "the focus of a phase two investigation is to document if there's been a release from a source before you start placing additional wells or doing additional investigation further down gradient or off the site." Tr. at 743. As he elaborated:

A phase two investigation is really to primarily focus on what you think or anybody thinks is the source of contamination. If it's been established that there has been a significant release, then the next sequence of events would—to go off site to determine what it could

impact and how significant the impact would be.

Tr. at 747.

As for the high HRS score, Maher believed that it was simply a preliminary score "based upon unsubstantiated information." Tr. at 29.

## IV. The Phase II Report

D & B's Phase II report, dated January 1992, was not issued until five years after the second Consent Order. See Ex. 33 ("Phase II report"). Apparently based in large measure on the Phase II report, the DEC did not require the more detailed RI/FS recommended by EA Science in the Phase I report, and the landfill was not classified as a hazardous waste site. See Tr. at 758–59. Curiously, D & B recalculated the HRS to be 27.3, just under the minimum score for a hazardous waste site listing. Ex. 33 at 5–1. As Veraldi opined in that regard, an HRS "can be manipulated in a variety of ways that would involve perhaps sampling at different locations, perhaps sampling on certain days of low rainfall, a variety of factors can affect that hazardous ranking score." Tr. at 99.

The Phase II investigation principally relied on some surface water testing of the pond, reassessment of the data from the existing wells, and evaluation of new data from four clusters of state-of-the-art polyvinylchloride ("PVC") wells D & B caused to be installed just below the landfill, next to the old down-gradient wells in that location. See Tr. at 741–746. These new wells were designed to enhance test accuracy since the old wells were made from either iron or steel and the DEC "do[es] not recognize iron or steel wells for hazardous waste investigations." Tr. at 742.

The location of all the old and new wells and their relative proximities to the landfill and the pond is graphically depicted in the

attached reproduction of Exhibit I–1 (Addendum A). As shown therein, the old upgradient wells, designated UGW, were located due north of the landfill; the new wells, designated MW–1, MW–2, MW–3 and MW–4, were all in close proximity to the landfill, as were the old wells in that location, and the only wells near the pond were three old wells, designated WW (fifty-five feet), WM (thirty feet) and WE (nine feet), lying only about 150 feet north of the pond.

From all the data collected, Maher acknowledged that the Phase II investigation confirmed that "the landfill is a source of contamination." ·Tr. at 756. Nonetheless, he "did not consider the release of contaminants to be a significant threat to health and the environment," Tr. at 754–55, although he acknowledged that the discoloration of the pond was "not a good situation." Tr. at 812. Consequently, Maher did not believe that new tests of the old W wells were indicated, let alone the installation of new improved PVC wells near the pond. As Maher testified in response to the Court's questioning:

THE COURT: But you did come to the conclusion that there was a release from the landfill, if I understand this case correctly, but nonetheless, you decided that you would not put in new PVC wells down by the W wells, that were either lead or iron.

You know that I was going to ask that question because I focused a lot of my questioning to Mr. Tonjes about that. And I'm anxious to get a sense of this, since we're talking about the decisions you made in terms of the numerosity of the wells and the placing of the wells.

THE WITNESS: The reason we didn't do any further investigation off site, and when I say off site groundwater investigation, because we did take a took at the stream and the creek and the

pond, was· because in our opinion there was not a significant release of contamination and more important, not a significant threat to health and the environment, and that's as defined by the super fund program.

THE COURT: Notwithstanding the obvious discoloration of the bodies of water that you're talking about here?

THE WITNESS: Well, again, we had some information on the characteristics of the Plume. We didn't feel in large part that the body of the Plume was impacting that water; that there could be other sources of contamination and, therefore, that the landfill was not a significant threat to health and the environment, that was our opinion.

Tr. at 743–44.

Specifically, Maher believed the following two factors supported his opinions: (1) that runoff water from the construction of Woodside Avenue in 1976, residential construction and residential septic tanks, as well as a certain marshy area, could have been contributing to the contamination of the pond and creek, see Tr. at 729–31, 735; (2) that "it did not appear that the main body of the Plume was being intercepted by the creek or the pond; that it was flowing beneath it, and therefore, no additional investigation in our opinion was required." Tr. at 759.

In respect to the possible "other sources" for the contamination of Motts Pond and Motts Creek, Veraldi rendered convincing and credible testimony when questioned about this aspect of the Phase II report:

Q. I'm, going to read you one part of the phase two report, it's on page 1–4.

"Although these contaminants could result from landfill Leachate, some or all could also originate from other sources such as a marsh immediately south of

the landfill, storm waters run off and on-site waste water disposal systems, as well as naturally occurring contaminants such as Iron."

Do you agree with that statement?

A. Well, I also read that statement and when we did our walk through, there is in this area, just north of Woodside Avenue, what could be described as a small marsh area. This is a living, thriving community. The water is clear, it does not have an orange pigmentation to it, so I think that rules out this marsh area as a potential source of the contaminant.

As far as residential contamination sources, I don't see any reason that Iron would be a contaminated source from residential use. And don't find that at all consistent with what we found.

The residential area along the' northern part of Canaan Lake, which is certainly more densely populated, does not show effects that are described along Motts Pond. This here is all pristine and there's certainly a more dense population in this area than this area here.

Tr. at 62–63.

In addition, Veraldi noted that a cemetery near the landfill was not "in the direct line of the groundwater." Tr. at 150. Furthermore, despite suggesting that run-off water or residential septic tanks could have been contributing factors in contamination of the pond and creek, see Tr. at 729–30, Maher acknowledged when questioned by the Court that D & B did not conduct any testing to determine whether residential sanitary systems and stormwater runoff were in fact contributing to the contamination. See Tr. at 821–25, 829–830.

As for whether the underground leachate plume could intercept the surface waters of the pond and creek, Tonjes provided critical testimony. First, he acknowledged that "[t]he chemistry of the pond is very similar to that of the Leachate Plume," although septic systems have a similar chemistry, Tr. at 556–57, and that the leachate plume "was definitely coming from the landfill." Tr. at 567. He could not conclude, however, that the landfill was the cause of the contamination because "there's no mechanism—there's no evidence for a mechanism to get the contamination from deep in the aquifer all of a sudden rising very suddenly into the pond." Tr. at 569. In that respect, Tonjes testified that the data collected from the new wells, which as previously noted were in close proximity to the landfill rather than to the pond and creek, showed "the Leachate Plume is sinking slightly .in the aquifer as it moves from the landfill, and so that by the time that the Plume reaches the W set of wells located just north of the pond ... there appears to be a small ledge or a small slice of relatively uncontaminated groundwater, so that there's essentially uncontaminated groundwater and then the contamination." Tr. at 555. Specifically, the shallowest well closest to the pond, the old W–9 well, which was approximately ten-feet deep in the aquifer, showed "little to no contamination," in Tonjes's opinion. Tr. at 558. By contrast, the old W wells thirty-to-fifty-feet deep in the aquifer showed "high levels of contamination at or about the place where the chemistry of the pond, so to speak, leaves something to be desired." Tr. at 568.

Tonjes candidly told the Court, however, that there might be more that could have been done to discern whether there was a connection between the contaminated sinking plume and the contaminated pond. He felt professionally constrained, however, from giving the matter "more thought" because "[t]he terms under which I work

for the Town are not such that I can do all that I feel professionally." Tr. at 571. When questioned by the Court as to whether it was within the realm of scientific probability that contamination thirty-to-fifty-feet deep could be a primary or significant contributing factor in causing the chemistry of the pond, notwithstanding the data from the W–9 well, Tonjes acknowledged that "[i]t's not impossible," Tr. at 600, but that "there is not enough data to firmly state . . . what is going on"—whether the contamination in the pond was caused by the vertical flow of the plume or by a shallow horizontal flow of groundwater unimpacted by the plume. Tr. at 604. The Court consequently questioned Tonjes at length about the phenomena of the "sinking Plume." Tr. 690.

Initially, Tonjes stated that "[i]t is true that if there were a hydraulic, an obvious hydraulic connection between the Plume and the contamination in the pond, there would be no dispute about the source of contamination." Tr. at 690. His testimony continued in that vein, as follows:

THE COURT: By hydraulic connection you mean that it's not sinking, that there's a connection?

THE WITNESS: A physical connection between the Plume and the contamination in the pond.

THE COURT: And that's what you say is missing here, this hydraulic connection as you phrase it?

THE WITNESS: That is, it's a necessary component to make the link between the Plume and the contamination.

. . . . .

THE COURT: I'm coming from the landfill, everything seems to be flowing a certain direction. These wells, the samples, the MW's we've been through all of that. We know what the lay of the land is.

So we come down to this W–9 well . . . and that seems to be a matter of great significance . . . that because [ ] that W–9 well supports your conclusion, together with perhaps other observations or other factors, that this Plume is sinking, it's going to the bottom of the drink so to speak, and that's the hydraulic issue, I think that's what you mean.

If it wasn't sinking, you then have perhaps a different opinion, but the fact that it is sinking firms up your belief as an expert that you can't or I cannot, I guess, the fact-finder, make the requisite linkage between the conditions in the pond that ha[ve] been testified to, and the Leachate Plume that is emanating from the landfill.

Now, am I on the same page here or not?

THE WITNESS: Yes, your honor.

THE COURT: All right.

THE WITNESS: The sinking Plume.

THE COURT: The sinking Plume sinks the plaintiff's lawsuit?

THE WITNESS: Yes, sir.

THE COURT: And that's based primarily on the W–9 well that's the data that you use to support that?

THE WITNESS: It's the only appropriate point to make that judgment, yes, sir. There is no other source of data.

. . . . .

THE COURT: [ ] But what is consistent, it seems to me, is the chemistry of the pond and the chemistry of the stream, both apparently leading into the pond and emanating from the pond, going into the I guess the head water of the—maybe not the head water, what do you call the entrance to the lake, would it be the head water?

THE WITNESS: A mouth from the pond into the lake.

THE COURT: There seems to be a consistency in that aspect and it's unexplained as to why the surface waters appear to be contaminated or are contaminated and that's the sort of the puzzlement here.

THE WITNESS: There seems to be a unique set of circumstances surrounding this pond which have combined to create the chemistry of that pond.

THE COURT: That's pretty much based upon the test results from the W-9 well essentially?

THE WITNESS: That there's a unique set of circumstances in this pond?

THE COURT: That creates the mystery so to speak as to what's causing this?

THE WITNESS: It's the key piece of data.

THE COURT: It's the key piece of data, all right.

THE WITNESS: In excluding the landfill Leachate Plume, yes, sir.

Tr. at 690–96.

## V. The Court's Expert

In light of Tonjes' testimony, the Court decided to appoint an expert, pursuant to Federal Rule of Evidence 706, to evaluate the existing data in order to assist the Court in assessing its technical aspects and in determining whether there was a scientific explanation for the contamination in Motts Pond and Motts Creek in light of the sinking plume.

The Court chose as its expert Dr. Raymond A. Ferrara, President and founder of Omni Environmental Corporation of Princeton, New Jersey. Dr. Ferrara had been the head of the Civil Engineering Department of Lafayette College, and was formerly an Assistant Professor at Princeton University, where he was the Director of its Water Resources Program. *See* Ex. H–1 ("Environmental Aspects Related to Aiello, et al. v. Town of Brookhaven" ("Ferrara report"), dated February 19, 1999, App. A ("Raymond A. Ferrara, Curriculum Vitae")). His stated expertise "in water quality modeling and monitoring, contaminant fate and transport in water resource systems, and [National Pollutant Discharge Elimination System] permitting," *id.* at 1, has not been challenged by the parties; nor his impartiality to render expert opinion in this case.

The Court requested Dr. Ferrara to render a written report regarding: "(1) the validity of the data upon which the opinions given by the plaintiffs' and defendant's experts have been based; (2) whether Canaan Lake and Motts Creek experience contaminant loadings from one or several sources; (3) the path of the contaminant plume, if any, from the Holtsville Landfill; and (4) the hydrogeologic interactions between the ground waters and surface waters in the area of study." Order of the Court, Oct. 5, 1998. Upon receipt of Dr. Ferrara's report, the Court conducted a hearing to permit the parties, as well as the Court, to question Dr. Ferrara under oath about his findings and conclusions. *See* Order of the Court, Feb. 25, 1999.

In respect to whether the leachate plume emanated from the landfill, Dr. Ferrara testified as follows:

Q. All right, just tell us now what you believe to be the primary difference or the primary significance between the up gradient and the down gradient from the data that you assessed.

A. Well, I looked at ammonia, total dissolved solids, iron, manganese and various organic chemicals and what I found is the concentrations for all of those were elevated in the down gradi-

ent wells as compared to the up gradient wells.

Q. And what conclusions does one draw from that from the technical point of view?

A. Well, simply looking at the data all it tells you is that there is a significant— there is a change from up gradient to down gradient.

Q. All right.

A. The next step was to look at what can likely have caused those changes and based upon all the information available to me, *the only apparent cause for that would be leachate from the landfill.*

Ferrara Tr. at 23 (emphasis added).[13]

In addition to concluding that "the overwhelming weight of the data point to the landfill site as the source of contamination," Ex. H–1 at 16, Dr. Ferrara's report detailed that the ammonia-N, iron and manganese present in the leachate were also reflected in significant amounts in the data obtained from the pond and creek's surface waters, confirming that the contamination in the plume was, as Tonjes had acknowledged, chemically similar to the contamination in the pond and creek. *See* Tr. at 568. In discussing the toxic chemical condition of the groundwater and surface waters Dr. Ferrara explained why the only source of the contamination in the pond and creek was the landfill, notwithstanding the so-called sinking plume, and the effect of the contaminants on human life and the environment.

### A. The Sinking Plume

Initially, Dr. Ferrara explained that when falling water hits the unlined landfill it "seeps through" and "comes out of the landfill as leachate." Ferrara Tr. at 16.

This leachate consists of dissolved chemicals and takes the form of a plume. *See id.* at 17. Thus, a plume is "an area of demarcation in the ground water, the shallow ground water, which contains chemicals which have been leached from the landfill materials." *Id.* Dr. Ferrara explained that as the plume moves from the landfill it will spread both vertically and horizontally since "[t]he geohydrology in this area appears to be such that there are no particular confined or confining layers that would impede the movement of water." *Id.* at 17–18. Dr. Ferrara further explained that this horizontal and vertical movement acts like a "wedge," and that "the wedge gets wider as you move further down from the landfill." *Id.* at 31. This explains why there may be higher concentrations of contaminants at lower levels further from the landfill. *See id.* Therefore, in respect to the cluster of W wells— at depths of nine feet, thirty feet and "perhaps sixty-seven" feet—"you see a little bit higher concentrations at that middle depth." *Id.* at 32.

Dr. Ferrara acknowledged that the chemicals in a leachate plume can degrade and will dilute to some extent as they move down-gradient from a landfill. *Id.* at 55–56. This, however, did not alter his observation that "concentrations even at the shallowest [W] well which is screened at a depth of only 9 feet are increased well above the levels observed at the comparable background wells." Ex. H–1 at 12. This indicated to Dr. Ferrara that "the plume from the landfill is staying fairly shallow. It's not going straight down. It's staying and gradually, perhaps, sinking or spreading out as it moves downstream." Ferrara Tr. at 30–31.

---

**13.** "Ferrara Tr." refers to the transcript of Dr. Ferrara's trial testimony before the Court on May 17, 1999.

In addition to testifying that the W–9 well did indeed contain higher levels of contamination when compared to comparable background wells, Dr. Ferrara was "certain," when questioned about the higher readings in the mid-level W well, "that ground water is being pumped into the Pond." *Id.* at 78. He noted in that respect that "it's really all one ground water aquifer at that location," *id.* at 82, and explained throughout his report and testimony how the contaminants from the landfill could surface in the pond.

To begin, Dr. Ferrara's report states that regional analysis for a 1978 Long Island Waste Management Plan showed that the landfill is located in a "ground water discharge area." Ex. H–1 at 4. This means that "ground water feeds surface water systems in this general area by flowing from the subsurface into surface water systems." *Id.* at 4–5; *see id.* at 13. Groundwater discharge can occur locally where "low topography intersects the water table. This appears to be the case further downgradient from the landfill where Motts Creek begins to form." *Id.* at 5. Moreover, the United States Department of the Interior Geological Survey topographical map of the Patchogue Quadrangle shows that "the creek bed elevation is approximately the same as the water table elevation, and therefore the creek would intercept horizontally flowing ground water." *Id.* at 5. Therefore, since the similarity in elevation between the groundwater and the creek bed means it "can intercept the ground water table in this area," "[s]uch naturally intercepted ground water provides baseflow in Motts Creek." *Id.* at 13. It consequently means that contaminants "emanating from the landfill to the ground water system would have an opportunity to enter Motts Creek." *Id.* at 14.

## B. The Chemical Contamination of the Pond and Creek Attributable to the Landfill

In assessing the chemical contamination of the pond and creek, Dr. Ferrara "considered all data that were presented in the case, which include[d] the data collected back in 1987 by EA Engineering, data collected as part of the '92 report by [Dvirka] & Bartilucci, ongoing data collected by the Town, data presented by Mr. Veraldi." Ferrara Tr. at 27. In regard to groundwater contamination, Dr. Ferrara examined the findings of the Phase I and Phase II reports, as well as reports compiled by Veraldi as part of his testing in June 1996, and other data from the Town's database. *See* Ex. H–1 at 6–7 (citing Ex. 27; Ex. 33; Ex. 84–B; Ex. 84–C; Ex. 84–D; Ex. 85; Ex. I–3; Ex. I–4). In respect to Veraldi's data, Dr. Ferrara only considered that data which was consistent with the other data since appropriate concerns had been expressed about the validity of Veraldi's samplings because "exact protocols may not have been followed for those data." Ferrara Tr. at 28.

Dr. Ferrara also examined data concerning contamination of surface water sampled in the pond, the intermittent stream north of the pond, the creek south of the pond, the mouth of Canaan Lake and standing water near the landfill. *See* H–1 at 17, 19. These "[s]urface water sampling results [were] available from the Town's database and the Phase II investigation conducted by [D & B] in 1992." *Id.* at 17 (citing Phase II report, Ex. 33). Dr. Ferrara analyzed the data from these sources and set forth his analysis in Tables B–3 and B–4 of his report. *See* Ex. H–1 at 17, B–10 (Table B–3), B–11 to B–12 (Table B–4). According to Dr. Ferrara, the data show in relevant part that

the observed surface water levels of ammonia, [total dissolved solids], iron and

manganese are substantially higher than those observed at the upgradient wells. Furthermore, they are comparable to the levels found in the downgradient wells....

*Id.* at 20.[14] Taking all the information assembled by Dr. Ferrara regarding groundwater and surface water, the data established the following concerning ammonia-N, iron, manganese and other chemicals found in the leachate plume:

## 1. Ammonia-N

Regarding ammonia-N, which is "colorless," Ferrara Tr. at 34, concentrations above 2 milligrams per liter ("mg/l") are in excess of acceptable DEC groundwater standards. *See* Ex. H-1 at 15. At upgradient well sites, mean ammonia-N concentrations were all well below 2 mg/l. *See* Ex. H-1 at B-1 to B-2 (Table B-1). At well sites down-gradient of the landfill, mean ammonia-N concentration consistently exceeded acceptable water quality standards by orders of magnitude—in some wells by as much as thirty and forty times. *See* Ex. H-1 at B-3 to B-9 (Table B-2).

Ammonia-N was also found in the pond's surface water in concentrations that greatly exceeded "existing NYSDEC surface water standards or guidelines." Ex. 33 at 4-49; *see* Ex. H-1 at B-11 (Table B-4). The DEC surface water standard for ammonia-N is 8.10 mg/l in surface waters such as the pond and creek and 1.64 mg/l for surface waters like Canaan Lake.[15] Ex. 33 at 4-53. Specifically, sampling of surface water at five points in the intermittent stream, north of the pond, showed mean ammonia-N concentrations of 9.982 mg/l, 22.9 mg/l, 15.5 mg/l, 8.03 mg/l and 4.5 mg/l. Ex. H-1 at 19, B-11 (Table B-4). The pond itself had a concentration of 20.3 mg/l. *Id.* at 19, B-12 (Table B-4). Three points in the creek, south of the pond, revealed mean concentrations of 21.6 mg/l, 20.54 mg/l and 16.7 mg/l. *Id.* Testing of standing water at four points north of the intermittent stream, near the landfill, showed mean concentrations of less than 0.04 mg/l, 4.75 mg/l, 0.20 mg/l and less than 0.04 mg/l. *Id.* at 19, B-13 (Table B-4). Almost all surface water data from the pond and creek indicated the presence of ammonia-N at levels far in excess of the permissible standard of 8.10 mg/l.

Dr. Ferrara concluded that the source of ammonia-N contamination in the pond and creek was groundwater affected by the landfill. *See* Ex. H-1 at 20, 21. As he testified, this chemical "would be indicative of the kinds of leachate you might expect from a landfill, particularly one which has received septic and sludges over the years and we do know that to be the case in this particular landfill;" in any event "ammonia is a common [constituent] of landfill leachate." Ferrara Tr. at 25-26. Dr. Ferrara also testified that the quantities of ammonia in the pond, although not a threat to human life, were sufficient to cause an impact to aquatic life. *See id.* at 35.

## 2. Iron

In respect to iron, Dr. Ferrara explained that it reacts with hydroxides in water to form iron precipitates, which, in turn,

---

14. Dr. Ferrara observed that contamination in the surface water is lower "than the levels found in the more shallow (i.e., less than 100 feet deep) downgradient wells," Ex. H-1 at 20, consistent with the sinking plume scenario.

15. Dr. Ferrara notes that the "actual numerical value of the water quality standard for ammonia is a function of the ph and temperature of the water body, and hence a variable. However, for the conditions in Motts Creek, ammonia nitrogen values above approximately 2 mg/l would certainly be in excess of the water quality standard." Ex. H-1 at 20 n. 10.

cause water to turn an orange-reddish color. *See id.* The DEC groundwater standard for iron for the protection of human health and drinking water is 0.3 mg/l. *See* Ex. H–1 at 15. Dr. Ferrara noted that there were three occasions when high iron readings came from the old UGW up-gradient wells. He believed that these were "erratic values," probably impacted by the fact that the casings of the old wells, unlike the new PVC wells, were possibly made of iron, since the other readings from the UGW wells suggested that "background iron levels [in the UGW wells] are typically less than 1 mg/l." *Id.* at 9–10. Moreover, the readings from the other up-gradient wells, the MW–1 wells, were very low—"around 0.1 to 0.2 mg/l." Ex. H–1 at 10.

As for the down-gradient wells, the average iron concentration at the new MW–2–S well was 15.8 mg/l, which, as Dr. Ferrara testified, "confirm[ed] an impact in the shallow aquifer." *Id.* at 11. Significantly, Dr. Ferrara noted the "paucity of data" at two of the other new down-gradient wells, which made it "difficult to come to any firm conclusions based on their measurements." Ex. H–1 at 11. Nonetheless, from the existing data he concluded that the concentrations of iron in the down-gradient wells was "an order or two orders of magnitude higher" than the iron in the up-gradient wells. Ferrara Tr. at 26–27. In particular, Dr. Ferrara observed that the mean concentration of iron found in the down-gradient W–9 well was 11.2 mg/l and the mean concentration in the down-gradient W–30 well was 30.7 mg/l. Ex. H–1 at B–9 (Table B–2). Notwithstanding the high readings from these old wells closest to the pond, which arguably could be ascribed to their iron or steel construction, D & B did not question their accuracy in their Phase II report and, as

previously noted, did not see fit to install new PVC wells near them or conduct other samplings of the groundwater in the vicinity of the pond. *See* Tr. at 743–44.

In regard to surface water in the creek and pond, the DEC standard for iron is 0.3 mg/l. Ex. H–1 at 20. The Phase II report acknowledged that in D & B's surface water testing, "iron was detected … at concentrations exceeding NYSDEC surface water standards." Ex. 33 at 4–49. In addition, "initial and supplemental investigations" of surface water sediment found iron "at concentrations which are elevated in comparison to background levels." *Id.* at 4–43. The Phase II report also observed that the "water quality guideline for color is exceeded" in certain surface water samples, *id.* at 4–53, and that such "elevated color values may be attributed to the high iron concentrations found in these waters." *Id.*

In particular, mean concentrations of iron in surface water samples taken by D & B north of the pond were 9.67 mg/l, 19 mg/l, 7.60 mg/l, 3.83 mg/l and 22.8 mg/l. Ex. H–1 at 19, B–11 (Table B–4). The pond contained a mean iron concentration of 8.55 mg/l. *Id.* South of the pond, sampling showed mean iron concentrations at 10.8 mg/l, 9.20 mg/l and 1.82 mg/l, the lowest of which was located in the mouth of Canaan Lake. *See id.* at 19, B–12.

Concerning the effect of the iron contamination on health and the environment, Dr. Ferrara testified that it had no effect on human health since "it's not of such a level that it would be toxic and no one is drinking that water anyway." Ferrara Tr. at 37. Nor did he detect any odors from the pond when he conducted a site visit. *Id.* at 59, 91.[16] In respect to aquatic life, Dr. Ferrara stated that although the ammonia standard "is clearly for the protec-

---

16. Neither did the Court detect any odors during its site visit.

tion of aquatic life . . . the iron is not." *Id.* at 38. Consequently, the only impact of the iron would be aesthetic—the pronounced discoloration of the pond. *See id.*

### 3. Manganese

As for manganese, the DEC groundwater standard, like iron, is 0.3 mg/l, and the standard for the sum of iron and manganese is 0.5 mg/l. *See* Ex. H–1 at 15. These standards are established for the protection of human health and drinking water sources. *Id.* Manganese levels, standing alone, did not exceed standard acceptable concentration levels in the up-gradient wells. *See* Ex. H–1 at 15–16. When combined with iron, however, the sum of the two contaminants exceeded 0.5 mg/l in the older up-gradient well cluster, perhaps due to the metal casings. *Id.* at B–1 to B–2 (Table B–1). In the down-gradient wells, the standard for manganese was frequently exceeded, though not to the same magnitude as iron standing alone. *See id.* at B–1 to B–9 (Table B–2).

There is no DEC surface water standard for manganese, but manganese concentrations in such waters "are substantially higher" than those observed in up-gradient groundwater wells and comparable to levels in down-gradient wells. *Id.* at 20, B–11 to B–13 (Table B–4). Concentration levels tended to increase in the south-southeasterly direction from the landfill toward the creek and Canaan Lake. *See* Ex. 33 at 4–49 to 4–53; Ex. H–1 at 19, B–11 to B–13 (Table B–4). In particular, surface water testing in the intermittent stream north of the pond revealed mean concentrations of manganese of 0.375 mg/l, 0.377 mg/l, 2.01 mg/l, 0.519 mg/l and 0.542 mg/l. Ex. H–1 at B–11 (Table B–4). The pond contained a mean concentration of manganese of 4.78 mg/l. *Id.* at B–12 (Table B–4). Three samplings of surface water south of the pond in the creek showed mean concentrations

of 5.99 mg/l, 5.90 mg/l and 7.05 mg/l. *Id.* Testing of standing water at four points north of the intermittent stream near the landfill reflected mean manganese concentrations of 0.055 mg/l, 0.029 mg/l, 0.019 mg/l and 0.026 mg/l. *Id.* at B–13 (Table B–4).

Although manganese can produce a blackish tinge in water, it possesses no significant health risks and is not a threat to aquatic life. *See* Ferrara Tr. at 38, 91. "It's merely an aesthetic consideration in conjunction with the iron." *Id.* at 38. However, since iron precipitates so dominate, no impact could be observed from the elevated levels of manganese. *See id.* at 91.

### 4. Other Chemicals

Dr. Ferrara observed that groundwater testing revealed the presence of five organic chemicals "that warrant attention." *See* Ex. H–1 at 13. Two of these, bis(2–ethylhexyl)phthalate and methylene chloride could be "discounted" as "common laboratory contaminants." *Id.* Three others, however, appeared in more noticeable levels. *Id.* Detections of benzene, chlorobenzene and dichlorobenzene, especially in the M, W, MW–2–S and MW–3–S wells, "suggest that the landfill may be leaching some organic chemicals" although "[l]arge scale organic chemical pollution of the ground water does not appear to be occurring" as a result of these chemicals. *Id.*

Dr. Ferrara's report and testimony reinforced Veraldi's testimony in the face of the Town's concerted efforts to discredit Veraldi's protocol for his samplings and to cast aspersions on the value of his testimony because of his low standing in his college ranks. *See, e.g.*, Tr. at 105–115, 230–33, 338–39. In concluding, as did Dr. Ferrara, that "the leachate plume that contains contaminants . . . is traveling in a direct path that impacts Motts Pond and

impacts it severely enough to cause the environmental conditions that are present," Tr. at 45, Veraldi based his opinion, like Dr. Ferrara, "mainly" on the Phase I and Phase II reports. *Id.; see* Ferrara Tr. at 23, 27. Veraldi also testified that he had "physically tracked this Iron laden plume directly into Motts Creek." Tr. at 76.

### C. Elimination of Other Sources

Dr. Ferrara acknowledged that a variety of down-gradient sources other than the landfill, including plaintiffs' homes, sewage systems, lawn runoff, business use, a cemetery or rainfall, could contribute to down-gradient surface water contamination. *See* Ferrara Tr. at 16, 71. However, Dr. Ferrara agreed with Veraldi that "other sources" do not explain the contamination of the pond and creek. *See* Ex. H–1 at 14. As he testified:

> [T]here were some other possibilities suggested as potentially causing that, including impacts from the surrounding land uses but if that were the case, then we would have seen changes in the up gradient wells as well . . . we would have seen the same quality in the up gradient well.
>
> Another suggestion was potentially that septic systems, residential use below the landfill may have impacted the down gradient wells. If that were the case, we would have seen probably more impact to nitrate. We would have also not seen impacts to some of the wells which are immediately down gradient from the landfill but not at a point where they could have yet been impacted by other

land uses in the surrounding area. On my site visit, I didn't see any other likely causes for the kinds of impacts that are observed in those wells.

Ferrara Tr. at 23–24.

Thus, as Dr. Ferrara stated in his report, "given the material or other information presented in this case, concluding that such activities are responsible for the observed ground water. quality, borders on speculation." Ex. H–1 at 14.

### DISCUSSION

Given the foregoing facts, the Court concludes that the Town violated the federal Resource Conservation and Recovery Act but not the Clean Water Act.

### I. Resource Conservation and Recovery Act

#### A. Statutory and Regulatory Framework

"RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.,* 516 U.S. 479, 483, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). Its underlying purpose is twofold: First, it creates a "cradle-to-grave" regulatory framework, *Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.,* 989 F.2d 1305, 1313 (2d Cir.1993), the aim of which is to "reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" *Meghrig,* 516 U.S. at 483, 116 S.Ct. 1251 (quoting 42 U.S.C. § 6902(b)); [17]

**17.** RCRA is codified at 42 U.S.C. §§ 6901 *et seq.* (1994, Supps.1996, 1997). It is worth clarifying that some courts, in discussing RCRA, refer to its provisions by the section numbers found in the act as enacted in 1976. Thus, for example, 42 U.S.C. § 6972 is some-

times referred to as § 7002 of the 1976 act and 42 U.S.C. § 6973 as § 7003. *See* Pub.L. No. 94–580, §§ 7002, 7003, 1976 U.S.C.C.A.N. (90 Stat.) 2825, 2826 (codified at 42 U.S.C. §§ 6972, 6973). The Court will

*see also Prisco v. A & D Carting Corp.,* 168 F.3d 593, 608 (2d Cir.1999). Second, it provides for litigation to enforce this prophylactic regulatory framework and to redress those situations where the treatment, storage or disposal of solid or hazardous waste may actually have caused "an imminent and substantial endangerment to health or the environment." *See* 42 U.S.C. §§ 6972(a)(1)(B), 6973(a).

RCRA was enacted in 1976 but had its antecedents in the Solid Waste Disposal Act of 1965. *See* Pub.L. No. 94–580; *see also* Pub.L. No. 89–272, 1965 U.S.C.C.A.N. (79 Stat.) 992 (codified at 42 U.S.C. §§ 3251 to 3254f). RCRA substantially amended the earlier statute and, as a result, the terms "RCRA" and "Solid Waste Disposal Act" now are often used synonymously. *See Environmental Def. Fund v. Wheelabrator Techs., Inc.,* 931 F.2d 211, 212 (2d Cir.) (RCRA is "often called the 'Solid Waste Disposal Act' "), *cert. denied,* 502 U.S. 974, 112 S.Ct. 453, 116 L.Ed.2d 471 (1991). RCRA was one of several environmental statutes enacted by Congress within several years of each other to address environmental concerns.[18]

RCRA contains three citizen suit provisions:

Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf—

(1)(A) against any person (including (a) the United States, and (b) any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter; or

(B) against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment; or

(2) against the Administrator [of the EPA] where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

42 U.S.C. §§ 6972(a)(1)(A), 6972(a)(1)(B), 6972(a)(2).

Section 6972(a)(1)(B) came into existence when RCRA was amended in 1984,

refer to RCRA's provisions as codified in the United States Code.

18. For example, the Clean Water Act, was enacted in 1972 as the Federal Water Pollution Control Act Amendments of 1972, Pub.L. No. 92–500, 1972 U.S.C.C.A.N. (86 Stat.) 816 (codified at 33 U.S.C. §§ 1251 *et seq.* (1994, Supps.1996, 1997, 1998)). It made it "unlawful for any person to discharge pollutants from any point source into navigable waters of the United States without obtaining a pollution discharge permit and complying with its terms." *Remington,* 989 F.2d at 1310–11

(citing, *inter alia,* 33 U.S.C. §§ 1311(a), 1342). Similarly, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), Pub.L. No. 96–510, 1980 U.S.C.C.A.N. (94 Stat.) 2767 (codified as amended at 42 U.S.C. §§ 9601 *et seq.* (1994, Supps.1996, 1997)), was enacted several years later in 1980 "in response to the serious environmental and health risks posed by industrial pollution." *United States v. Best-foods,* 524 U.S. 51, 55, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998).

*see* Pub.L. No. 98–616, 1984 U.S.C.C.A.N. (98 Stat.) 3221 (codified at 42 U.S.C. §§ 6901 *et seq.*), whereas §§ 6972(a)(1)(A) and (a)(2) date to RCRA's enactment in 1976. *See* Pub.L. 94–580. Thus, prior to 1984, a citizen suit could only be brought against anyone in violation of RCRA's regulatory scheme, under § 6972(a)(1)(A) (sometimes referred to as an "(a)(1)(A)" suit), or against the Administrator of the EPA (the "Administrator") to compel the Administrator to discharge a non-discretionary responsibility, under § 6972(a)(2).[19] The 1984 amendments retained those earlier citizen suit provisions but, by enacting § 6972(a)(1)(B) (sometimes referred to as an "(a)(1)(B)" suit), also conferred direct authority for citizens to bring suit to enjoin imminent and substantial health or environmental endangerments related to solid or hazardous waste. Section 6972(a)(1)(B) represented "an effort to invigorate citizen litigation," *see Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1158 (9th Cir.1989) (citing H.R.Rep. No. 98–198, at 53–54 (1984), *reprinted in* 1984 U.S.C.C.A.N. 5576, 5612–13), and was "intended to complement, not conflict with, federal regulatory and enforcement programs." Claire Whitney, *Citizen Suits in the 1984 RCRA Amendments,* 138 PLI/Crim. 55, 60–61 (Sept. 1, 1985).

RCRA creates several barriers to the institution of citizen suits. First, in all such suits, a plaintiff must notify the Administrator of the citizen's intent to initiate litigation. *See* 42 U.S.C. §§ 6972(b)(1), (b)(2), (c). In suits under § 6972(a)(1)(A), notice must also be given to "the State in which the alleged *violation* occurs," and "to any alleged *violator* of such permit, standard, regulation, condition, requirement, prohibition, or order." 42 U.S.C. §§ 6972(b)(1)(A)(ii), (iii) (emphasis added). In suits under § 6972(a)(1)(B), notice must also be given to "the State in which the alleged *endangerment* may occur," and to "any person alleged to have contributed or to be contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in subsection (a)(1)(B)." 42 U.S.C. §§ 6972(b)(2)(A)(ii), (iii) (emphasis added). In suits under § 6972(a)(2), notice only need be given to the Administrator. *See* 42 U.S.C. § 6972(c).[20] The rationale for notice requirements is to afford the government or the violator an opportunity to act in order to obviate the need for citizen intervention. *See Hallstrom v. Tillamook County*, 493 U.S. 20, 29, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989); *AM Int'l, Inc. v. Datacard Corp.*, 106 F.3d 1342, 1349 (7th Cir.1997).[21]

In addition to these notice requirements, citizen plaintiffs must satisfy strict delay requirements—waiting sixty days after providing notice before commencing a suit under § 6972(a)(1)(A) or § 6972(a)(2), and delaying ninety days in a § 6972(a)(1)(B) action—unless an identical exception Con-

**19.** Section 6972(a)(1)(A) was codified following RCRA's 1976 enactment at 42 U.S.C. § 6972(a)(1); the codification of § 6972(a)(2) remains unchanged. *See* Pub.L. 94–580; 42 U.S.C. § 6972(a)(2)

**20.** In addition, the EPA has promulgated regulations specifying the content of the notice "regarding an alleged violation of a permit, standard, regulation, condition, requirement, or order," *see* 40 C.F.R. § 254.3 (July 1, 1993), and the particular representatives of the state to whom notice should be directed if the state or one of its local agencies is the alleged RCRA violator. *See* 40 C.F.R. § 254.2 (July 1, 1993).

**21.** Citizen suits are statutorily precluded by a variety of governmental interventions, such as when the Administrator or a state is diligently prosecuting an action under RCRA or CERCLA, is engaged in a CERCLA removal action, or has incurred costs to conduct an RI/FS. *See* 42 U.S.C. § 6972(b)(2).

gress has carved out in respect to each of these delay provisions is applicable. *See* 42 U.S.C. §§ 6972(b)(1)(A), (b)(2)(A), (c). Under these delay provisions, "when a citizen, acting as a private attorney general, alleges a claim *respecting a violation of subchapter III* of RCRA—the section of the Act dealing with hazardous waste management—the suit may be commenced immediately after giving notice." *AM Int'l,* 106 F.3d at 1350 (internal quotation omitted) (emphasis added).[22] The purpose of this exception was aptly explained in *Dague v. City of Burlington,* 935 F.2d 1343, 1351 (2d Cir.1991), *rev'd in part on other grounds,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992):

> Congress obviously determined that with hazardous wastes the dangers of delay and the potential for greater damage to public health or the environment outweigh the justifications for the pre-suit delay periods. It struck the balance in favor of prompt citizen enforcement of hazardous waste violations over its other policy aims of encouraging nonjudicial and nonadversarial resolution of environmental conflicts.

Implicit in the notice and delay requirements under § 6972(a)(1)(B), and explicit in its text, is that any citizen suit seeking to abate an imminent and substantial hazard may be predicated either upon "solid *or* hazardous" waste. 42 U.S.C. § 6972(a)(1)(B) (emphasis added); *see Military Toxics Project v. EPA,* 146 F.3d 948, 951 (D.C.Cir.1998); *Remington,* 989 F.2d at 1314–16. "Under RCRA, 'hazardous wastes' are a subset of 'solid wastes.'" *Id.* at 1313 (citing 42 U.S.C. § 6903(5)). "Thus, although all hazardous wastes are solid wastes, not all solid wastes are hazardous wastes." *United Techs. Corp. v.*

*EPA,* 821 F.2d 714, 717 n. 1 (D.C.Cir. 1987).

RCRA defines "solid waste" as

> any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities.

42 U.S.C. § 6903(27); *see also Remington,* 989 F.2d at 1314–15.

"Hazardous waste" is defined as

> a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—
>
> (A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible illness; or
>
> (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5).

Congress has provided under subchapter III of RCRA that certain wastes should be subject to more stringent regulations than the broad universe of wastes coming under the umbrella of these statutory definitions, and has charged the Administrator to "develop and promulgate criteria for identifying the characteristics of hazardous waste, and for listing hazardous waste, which should be subject to [regulation under subchapter III]." 42 U.S.C. § 6921(a). Thus, "for purposes of

---

**22.** Subchapter III of RCRA is comprised of 42 U.S.C. §§ 6921 to 6939e. Some courts have referred to "subchapter III" as "subtitle C," the designation given those provisions in the 1976 act. *See* Pub.L. No. 94–580.

[subchapter III] the EPA has provided a regulatory definition of solid waste that is distinct from the statutory definition." *Military Toxics*, 146 F.3d at 951 (citing *Remington*, 989 F.2d at 1314). As aptly explained by the District of Columbia Circuit in *Military Toxics*:

> Only a type of waste meeting the narrower regulatory definition of solid waste can be a hazardous waste within the meaning of [subchapter III]. A regulatory solid waste is deemed a hazardous waste for purposes of [subchapter III] if the Administrator has specifically listed that type of waste as a hazardous waste, *see* 40 C.F.R. Pt. 261, Subpt. D, or if it exhibits any of four hazardous characteristics: ignitability, corrosivity, reactivity, or toxicity, *see id.* Subpt. C.

146 F.3d at 951.

Significantly, regardless of whether solid or hazardous waste meets the restrictive characteristics warranting regulation under subchapter III, the Administrator or a citizen plaintiff may nonetheless "bring suit in order to force such action as may be necessary to abate 'an imminent and substantial endangerment to health or the environment' caused by solid waste." *Id.* Thus, as the Second Circuit made clear in *Dague*, an (a)(1)(B) citizen suit "does not depend on any specific subchapter III provision." *Dague*, 935 F.2d at 1352–53.

### B. Parties' Contentions

In respect to their RCRA claims, plaintiffs' complaint alleged both an (a)(1)(A) claim (Count 1) and an (a)(1)(B) claim (Count II).[23] After trial, plaintiffs withdrew their (a)(1)(A) claim, believing that the Town "was not subject to the permit requirement of RCRA because the Landfill had closed prior to the enactment of that statute." Pls.' Post-Trial Mem. at 8. Plaintiffs' (a)(1)(B) claim, when broken down into its constituent elements, requires plaintiffs to demonstrate that the Town

(1) is a "person"

(2) who "contributed ... to the past or present handling, storage, treatment, transportation or disposal"

(3) of any "solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."

42 U.S.C. § 6972(a)(1)(B); *see also ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 359 (2d Cir.1997); *Delaney v. Town of Carmel*, 55 F.Supp.2d 237, 250 (S.D.N.Y.1999), *declined to follow on other grounds, Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321 (2d Cir.), *cert. denied*, —— U.S. ——, 121 S.Ct. 427, 148 L.Ed.2d 436 (2000). A "person" may, but need not, include "any past or present owner or operator of a treatment, storage, or disposal facility." 42 U.S.C. § 6972(a)(1)(B).

Plaintiffs have alleged in their complaint, and have sought to establish at trial, that the Town's disposal of both solid and hazardous waste are implicated. They contend, specifically, that "the Town's possession, storage and disposal of solid waste and hazardous substances/toxic pollutants on the landfill presents an imminent and substantial endangerment to the environment." Pls.' Reply Mem. at 1. The Town concedes it is a "person" under RCRA, *see* Def.'s Post–Hearing Mem. at 10,[24] but ar-

---

**23.** The Court notes that plaintiffs' complaint was amended on January 20, 1995 to add additional parties, but remains identical to the original complaint in all relevant respects, *see* Compl.; Am. Compl. All references herein are to the original complaint.

**24.** The Town does not address whether it was a "person" who owned or operated a treat-

gues that it has not contributed to the "storage" or "disposal of" solid or hazardous waste, nor the "handling," "treatment," or "transportation" of such waste, as defined by RCRA, and, even if it had, such conduct did not cause an imminent and substantial endangerment to the environment. *See* Def.'s Post–Hearing Mem. at 10, 16–19.

### C. Subject Matter Jurisdiction

Before turning to the merits, there are two issues the Court has sua sponte considered in assessing its subject matter jurisdiction. *See Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 365 (2d Cir.2000) ("the trial court ... ha[s] an obligation to make [its] own independent determination that subject matter jurisdiction exists").

First, in regard to "standing," which is a "bedrock requirement" of jurisdiction under the Constitution, *Raines v. Byrd*, 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997), citizen plaintiffs, like other plaintiffs, must satisfy all relevant Article III requirements. *See Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99–100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979).

The "irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical.... Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendants and not ... th[e] result [of] the independent action of some third party not before the court.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation and citation omitted).

■ In regard to these requirements, the Supreme Court has determined in a number of environmental suits that harm to aesthetic interests is a valid basis to constitute an injury in fact, although it has yet to address the issue in the context of RCRA litigation. *See Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (holding in suit under the Administrative Procedure Act challenging U.S. Forest Service approval of forest development plan that injury to aesthetic, conservational or recreational interests is sufficient to confer standing); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (holding in suit under the CWA that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened'" (quoting *Sierra Club v. Morton*, 405 U.S. at 735, 92 S.Ct. 1361)); *Defenders of Wildlife*, 504 U.S. at

---

ment, storage or disposal *facility* since the Town would be liable regardless of what type of "person" it is deemed to be under § 6972(a)(1)(B). In any event, it is problematic whether an open, unregulated dump would be considered a "facility." When RCRA and CERCLA speak of a "facility," it is more in keeping with the construction, operation and maintenance of a sanitary landfill subject to permitting and regulation. *See, e.g., United Techs.*, 821 F.2d at 717, 721–23; *see also South Road Assocs. v. International Bus. Mach. Corp.*, 216 F.3d 251, 256 (2d Cir. 2000) ("[w]e put aside for now (and ultimately decide that we need not reach) the question whether [the open dump] site is a 'facility for the disposal of hazardous waste'").

563, 112 S.Ct. 2130 (holding in suit under Endangered Species Act that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing"). Other courts have specifically recognized aesthetics as a basis for standing under RCRA citizen suits. *See Citizens for Better Env't v. Caterpillar, Inc.*, 30 F.Supp.2d 1053, 1069 (C.D.Ill.1998) ("threat to the aesthetic well-being of the [allegedly polluted Illinois River] is a threat to" plaintiffs living "less than 10 miles from the river"); *Sierra Club v. Chemical Handling Corp.*, 778 F.Supp. 24, 25 (D.Colo.1991) ("[a]lleged injury to aesthetic ... interests is sufficient" to "demonstrate standing"); *Environmental Compliance Oversight Corp. v. Smithkline Beecham Corp.*, No. CIV. A. 94–1807, 1994 WL 695803, at *1 (E.D.Pa. Nov. 21, 1994) (standing exists when members of plaintiff organization "suffered or may suffer injury to their aesthetic and environmental interests"). Here, given the proximity of plaintiffs to the pond and creek, and their obvious interest in the environmental and health ramifications of contamination in those bodies of water, their standing is clearly manifested.

A more complex jurisdictional issue is triggered by reason of the Supreme Court's decision in *Hallstrom*. The precise issue before the Court was whether compliance with RCRA's notice require-ment "is a mandatory precondition to suit or can be disregarded by the district court at its discretion." *Hallstrom*, 493 U.S. at 23, 110 S.Ct. 304. Nonetheless, the Court also addressed RCRA's delay provisions holding that although it "d[id] not underestimate the potential damage to the environment that could ensue during the [ ] waiting period," *id.* at 30, 110 S.Ct. 304, both "the notice *and* [ ] delay requirements are mandatory conditions precedent to commencing suit under the RCRA citizen suit provision[s]," *id.* at 31, 110 S.Ct. 304 (emphasis added), and "a district court may not disregard these requirements at its discretion." *Id.* In reaching these conclusions, the Court observed that it "need not determine whether" the notice and delay requirements are "jurisdictional in the strict sense of the term." *Id.*

█ In the present case, plaintiffs gave appropriate notice but did not comply with any of the delay requirements applicable to their RCRA claims. Nor did they comply with a sixty-day delay requirement in regard to their CWA claim. *See* 33 U.S.C. § 1365(b)(1)(A).[25] Because *Hallstrom* places in issue the power of a district court to address the merits of claims subject to delay preconditions, the Court must consider whether the one exception to compliance with the ninety-day delay provision regarding an (a)(1)(B) suit—a claim respecting a violation of subchapter III—is applicable. In doing so, the Court is mind-

---

**25.** Plaintiffs' complaint was filed and served on May 16, 1994. *See* Aff. of Service of Jennifer Lupo, May 16, 1994; Compl. at 1. In their complaint they alleged in respect to each RCRA claim, as well as in respect to their CWA claim, that all requisite notices had been duly given on May 10, 1994, and "that this lawsuit would be immediately commenced." Compl. ¶¶ 29, 40, 45. Because the Town denied information or knowledge sufficient to form a belief as to the truth of these allegations, the Court ordered plaintiffs to provide proof of compliance with the notice require-ments. *See* Order of the Court, Feb. 15, 2001; *see also Linardos· v. Fortuna*, 157 F.3d 945, 947 (2d Cir.1998) (holding that a party must support its allegations of a proper basis for jurisdiction by "competent proof" when a "court *sua sponte* raises the question"). Plaintiffs thereafter made an uncontested factual submission which establishes that appropriate notice had been given prior to the commencement of the lawsuit. *See* Ltr. of Bernard L. Burton, Esq., & Attachs., Feb. 20, 2001.

ful that Justice Marshall noted during his dissent in *Hallstrom* that whether the notice provision was waivable was not before the Supreme Court since, unlike here, the defendant timely raised the issue. *See Hallstrom*, 493 U.S. at 34 n*, 110 S.Ct. 304. He nonetheless expressed some curiosity as to whether the Court's decision "might be read to suggest that failure to comply with the [ ] notice provision deprives the court of subject matter jurisdiction, thereby obligating a court to dismiss a case filed in violation of the notice provision." *Id.* Justice Marshall deduced, however, that since the Court chose not to determine whether the notice and delay provisions were "jurisdictional in the strict sense of the term," he "d[id] not understand the Court to express any view on whether the notice requirement is waivable." *Id.* Since the Court here concludes that the hazardous waste exception applies, it need not address the unanswered jurisdictional issue posited by the Supreme Court in *Hallstrom*, and the potential fallout issue of waiver.

The Second Circuit's decision in *Dague* provides the appropriate analysis. There, just one day after giving the requisite notices, neighbors of a municipal landfill sued the municipality (1) under §§ 1316, 1317 of the Clean Water Act, for discharging pollutants into navigable waters from a point source without a permit; (2) under § 6972(a)(1)(A) of RCRA, for the violation of federal hazardous waste management regulations; (3) under § 6972(a)(1)(B) of RCRA, for the endangerment to the environment caused by the municipality's disposal of solid and hazardous waste. Leachate from solid waste deposited in the landfill contaminated certain waters. This leachate contained chemicals and compounds found on toxic and hazardous lists under subchapter III. The Second Circuit affirmed the district court's finding that (a)(1)(A) was not implicated since state

regulations superceded the RCRA regulations that were the basis of the (a)(1)(A) claims, and therefore "a direct action to enforce the RCRA regulations was not available to the plaintiffs." *Dague*, 935 F.2d at 1349.

In respect to the applicability of RCRA's delay exception to plaintiffs' (a)(1)(B) claim, the district court in *Dague* had determined that an imminent and substantial endangerment to health and the environment was established by reason of the municipality's violation of both subchapter III (hazardous waste management provisions) and subchapter IV (solid waste management provisions). The Second Circuit, however, expressed uncertainty as to whether the (a)(1)(B) claim was one " 'respecting a violation of subchapter III sufficient to trigger RCRA's exception to the delay period." *Id.* at 1353 (internal quotation omitted). It nonetheless held that there was sufficient evidence to support (a)(1)(B) liability, including the fact that the leachate contained chemicals and compounds found on the EPA toxic list.

In so holding, the court did not consider the failure to wait ninety days before bringing the (a)(1)(B) claim to be fatal, regardless of whether or not there were any cognizable subchapter III hazardous waste violations. Its rationale was based upon the hybrid nature of the complaint. The court distinguished *Hallstrom* because there "the plaintiffs had plainly disregarded the language of the statute by filing a complaint alleging only non-subchapter III violations without mailing any notice whatsoever." *Id.* at 1352. By contrast, the complaint in *Dague* clearly alleged subchapter III(a)(1)(A) violations. In the eyes of the court, these allegations were "sufficient to keep the 'hybrid' complaint in court," even though the (a)(1)(A) claim "ultimately proved to be unsuccessful," because "*Hallstrom* makes clear that the

notice determination is to be made at the outset, and in this case [the (a)(1)(A) count] survived defendant's motion for summary judgment." *Id.* at 1353. The court consequently also addressed the merits of the CWA claim, which otherwise would have foundered for failure to comply with a sixty-day delay requirement applicable to that claim. *See id.* 1353–54 ("[b]ecause ... the CWA claim was brought as part of a 'hybrid' complaint which simultaneously alleged hazardous waste violations under RCRA, there was no need to observe the 60–day delay requirement of § 1365").

In reaching its hybrid-complaint conclusion, the court addressed the concern "that plaintiffs can easily circumvent the delay requirements by simply alleging a subchapter III violation, whether or not it is meritorious" *id.* at 1352, commenting:

> [W]e do not think it outweighs Congress's manifest intent to encourage quick citizen enforcement of hazardous waste violations of subchapter III. Of course, if a plaintiff should allege frivolous subchapter III claims, he would not only be subject to rule 11 sanctions, but his claims could also be dismissed early in the litigation process, and the court, by stay or dismissal, could require full observance of the delay period. Moreover, in order to eliminate the delay requirement with a 'hybrid' complaint, the two types of violations would have to be closely related. In this case, for example, plaintiffs' subchapter III and non-subchapter III claims all arose from the operation of a single facility and are based on the same core of interrelated facts.

*Id.*

*Dague* was followed by the Seventh Circuit in *AM International.* In doing so, the court held that the (a)(1)(B) claim was not a claim "respecting a violation of RCRA's hazardous waste management regulations," 106 F.3d at 1350, rejecting the contention that claims "merely 'involving' hazardous waste, qualify under the language of the exception" to the delay period. *Id.* It nonetheless allowed the (a)(1)(B) claim to survive because the complaint also contained an (a)(1)(A) claim alleging a specific hazardous waste violation which, although unsuccessful, "was not frivolous." *Id.* at 1351.

Notably, the reservation expressed in *Dague* by the Second Circuit and the holding by the Seventh Circuit in *AM International* in respect to the issue of whether a subchapter III violation can be the basis for obviating compliance with the delay provision in an imminent danger suit under (a)(1)(B), was not the subject of analysis by either court. It is difficult for this Court to fathom just when the delay provision under (a)(1)(B) "respecting a violation of subchapter III," 42 U.S.C. § 6972(b)(2)(A), could ever attach if not in a situation, such as in *Dague*, where listed subchapter III toxic chemicals were part of the imminent danger. A more logical conclusion is to ascribe some significance to the reference to subchapter III under the (a)(1)(B) delay provision so that some meaning can be given to Congress's explicit language. *See Walters v. Metropolitan Educ. Enters., Inc.,* 519 U.S. 202, 209, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997) ("[s]tatutes must be interpreted, if possible, to give each word some operative effect"). It seems plausible that if subchapter III chemicals were present in an imminent danger suit, this type of endangerment would be of greater concern than hazardous or solid wastes in general and, hence, citizen plaintiff suits under (a)(1)(B) should not be delayed.

In the present case, in addition to alleging in their complaint both an (a)(1)(A) claim and an (a)(1)(B) claim, plaintiffs also

alleged a claim under the Clean Water Act, as in *Dague,* for violations of §§ 1316 and 1317 (Count III). However, in respect to the CWA claim, exceptions to the sixty-day delay provision under these sections clearly are not applicable. In regard to § 1316, none of the categories of sources listed therein are relevant. *See* 33 U.S.C. § 1316. As for § 1317, the court held in *Dague* that it "imposes obligations only on the EPA administrator, not the defendant city." *Dague,* 935 F.2d at 1353; *see* 33 U.S.C. § 1317.

In respect to the (a)(1)(A) claim, plaintiffs allege a host of subchapter III regulatory violations, such as the failure of the Town to obtain "a permit to dispose of hazardous wastes in and from the Landfill." Compl. ¶ 32. In respect to the (a)(1)(B) claim, they allege that "[t]he storage and disposal of hazardous wastes in the Landfill in violation of Subchapter III (Hazardous Waste Management) and of Subchapter IV (Solid Waste Management) of RCRA ... and the regulations promulgated thereunder, present an imminent and substantial endangerment to the public health and to the environment in and around the Landfill." *Id.* ¶ 41.

In support of both their RCRA claims, plaintiffs' complaint alleges that the Town disposed of "lead, mercury, tetrachloroethylene, trichloroethylene, 1,1,1–trichloroethane and chlorobenzene," *id.* ¶ 13, all of which are listed as hazardous wastes under subchapter III, *see* 40 C.F.R. §§ 261.31, 261.32, and hence subject to regulation and enforcement under (a)(1)(A). Whether these hazardous wastes would also serve as the basis for (a)(1)(B) liability would depend on whether they further constituted an imminent and substantial endangerment to health or the environment.

The trial established, as Dr. Ferrara noted, that at least one of the subchapter III chemicals itemized in the complaint,

chlorobenzene, was contained in the leachate plume. *See* Ex. H–1 at 13. However, it was not detected at levels sufficient to constitute "large scale organic chemical pollution of the ground water systems." *Id.* As for the three chemicals which did contaminate the pond and creek—ammonia-N, iron and manganese—none has been listed by the EPA as a hazardous waste, *see* 40 C.F.R. §§ 261.30 to 261.38 Apps. VII, VIII, or as exhibiting any of the requisite four hazardous waste characteristics, including toxicity. *See* 40 C.F.R. § 261.24 & Table 1. Consequently, no subchapter III chemicals have contributed to the viability of plaintiffs' (a)(1)(B) claim. Nonetheless, plaintiffs have brought a hybrid complaint and, unless the subchapter III component of their RCRA claims be deemed frivolous under (a)(1)(A) and not implicated in the delay exception to (a)(1)(B), the Court, as *Dague* instructs, should address the merits of the (a)(1)(B) and the CWA claims even though plaintiffs did not comply with those statutes' respective ninety- and sixty-day delay provisions.

Although plaintiffs have withdrawn their (a)(1)(A) claim, the Court does not believe that this claim was frivolous. Although in *Remington,* decided just a year before the plaintiffs brought their lawsuit, the Second Circuit dismissed a CWA claim because a past polluter could not be held liable for a continuing violation for the "mere decomposition of pollutants," *Remington,* 989 F.2d at 1313, it does not necessarily follow that *Remington* could be so clearly understood to hold that the same result would attach under an (a)(1)(A) RCRA claim, or even under a CWA claim, for the on going *migration* of a leachate plume. Indeed, although the Court relies on *Remington* in dismissing plaintiffs' CWA claim, *see infra,* it has recognized therein that the issue of what constitutes an "ongoing violation" is hardly free from doubt, has divided the circuits and has yet to be addressed by the Supreme Court. Moreover, the complexi-

ties of the intertwining of RCRA's discrete statutory and regulatory definitions under (a)(1)(A), which required elaborate analysis in *Remington,* are perplexing and not subject to facile comprehension. Indeed, the Second Circuit recently thought it helpful to explain that because of RCRA's dichotomous statutory/regulatory nature, *Remington* "employed no blanket test for whether a defendant is engaged in an ongoing violation of RCRA," requiring instead "a close reading of the allegations against the statute." *South Road Assocs.,* 216 F.3d at 254. In sum, the claim that leachate containing a subchapter III chemical leaking from a closed landfill could nonetheless be subject to regulation for purposes of (a)(1)(A) cannot be considered to have been frivolously made.

In any event, the Court also believes that regardless of whether the complaint's subchapter III allegations can be ascribed to a viable (a)(1)(A) claim, the presence of a subchapter III chemical in the leachate plume should nonetheless be considered as non-frivolous for the purpose of obviating the need to comply with the delay period in regard to plaintiffs' (a)(1)(B) claim. The Court does not read *Dague* as necessarily holding otherwise, and believes that Congress's intent in balancing the dangers of delay to health and the environment against encouraging nonjudicial and non-adversarial resolution of environmental conflicts is best manifested by permitting the immediate initiation of (a)(1)(B) imminent hazard suits whenever subchapter III hazardous chemicals can fairly be alleged to be a component of the endangerment. The Court will consequently address the merits of plaintiffs' (a)(1)(B) claim.

### D. Application of Statute

**1. Has Solid Waste Been Disposed of at the Landfill?**

The Court has factually determined that the leachate plume is the by-product of the solid waste that was disposed of in the town dump, and that the chemical composition of the leachate plume contaminated the groundwater leading from the dump to the pond and creek. This conclusion is in keeping with RCRA's statutory definition of "solid waste" as including "discarded material," and its definition of "disposal."

RCRA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." *Id.*

Although "discarded material" is not defined in RCRA, the court in *Remington,* noting that "the reach of RCRA was intended to be broad," 989 F.2d at 1314, quoted from the following House committee comment:

> It is not only the waste by-products of the nation's manufacturing processes with which the committee is concerned: but also the products themselves once they have served their intended purposes and are no longer wanted by the consumer. For these reasons *the term discarded materials is used to identify collectively those substances often referred to as industrial, municipal or post-consumer waste; refuse, trash, garbage and sludge.*

*Id.* (citing H.R.Rep. No. 94–1491, at 2 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6238, 6240 (emphasis added)). This concept of "discarded materials" fits precisely the composition of the landfill when it was the town dump.

The Town relies on *Prisco,* 168 F.3d 593, in arguing that plaintiffs have been "un-

able to prove what types of wastes are being released from the landfill other than by offering evidence that the limited leachate plume emanating from the former landfill contains ammonia, manganese and iron, and that the levels of these elements are elevated at the down gradient monitoring stations." Def.'s Post–Hearing Mem. at 13. In *Prisco,* the Second Circuit simply concluded that the district court did not err in finding that under the facts of that case the waste that a private landowner allowed to be deposited on his property was not "of a type that could contribute to an imminent and substantial endangerment to health or the environment" under RCRA. *Prisco,* 168 F.3d at 609. By contrast, in the present case, as the Court has found, the materials discarded at the dump were of a type that could have contributed to an imminent and substantial endangerment because the evidence clearly established that the iron, ammonia and manganese which contaminated the leachate plume resulted from the unrestricted nature of the discarded solid waste, encompassing the full range of "industrial municipal or post-consumer waste; refuse, trash, garbage and sludge." *Remington,* 989 F.2d at 1314 (internal quotation omitted).

## 2. Has the Town Contributed to the Past or Present Disposal of the Solid Waste?

■ Neither RCRA nor its regulations define "contribute to." In contending that it has not "contributed to" the disposal of solid waste, the Town relies on the ordinary meaning ascribed to that phrase as articulated in *Delaney,* that "[t]he term has been universally held to infer something more than mere ownership of a site; some level of causation between the contamination and the party to be held liable must be established." *See* Def.'s Post–Hearing Mem. at 10 (quoting *Delaney,* 55 F.Supp.2d at 256). It argues that "the fact

that the Town may have owned the Landfill 25 years ago is not enough to impose strict liability upon it for the solid waste which is purportedly leaching from the former landfill today." *Id.* at 11.

Because RCRA does not define "contribute to," the Court must resort to the basic principle that an undefined statutory phrase must be given its "ordinary or natural meaning." *National Broad. Co. v. Bear Stearns & Co.,* 165 F.3d 184, 188 (2d Cir.1999) (citing *FDIC v. Meyer,* 510 U.S. 471, 476, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)). Although the Court agrees with the general notion, as the district court in Delaney stated, that indeed there must be "some level of causation between contamination and the party to be held liable," *Delaney,* 55 F.Supp.2d at 256, the precise contours of such causation have yet to be explored by the Second Circuit. It has, however, defined what would constitute "arranging" for the disposal of waste for purposes of "arranger liability" under CERCLA. *See General Elec. Co. v. AAMCO Transmissions, Inc.,* 962 F.2d 281, 286 (2d Cir.1992); *see also B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1199 (2d Cir. 1992). As the court explained in *General Electric,* "there must be some nexus between the potentially responsible party and the disposal," 962 F.2d at 286, but this does not necessarily mean that arranger liability cannot attach " 'to parties that do not have active involvement regarding the timing, manner or location of disposal.' " *Id.* (quoting *CPC Int'l, Inc. v. Aerojet–General Corp.,* 759 F.Supp. 1269, 1279 (W.D.Mich.1991)). Rather, arranger liability may be exemplified by " 'whether the party *assumed responsibility* for determining [the waste's] fate.' " *Id.* (quoting *CPC Int'l,* 759 F.Supp. at 1278 (emphasis added by court in *General Elec.*)).

The Eighth Circuit has noted that the plain meaning of "contribute to" is "to

have a share in any act or effect," *United States v. Aceto Agric. Chems. Corp.*, 872 F.2d 1373, 1384 (8th Cir.1989) (citing *Webster's Third New International Dictionary* 496 (1961)), and " '[t]o have a share in' is arguably less involvement than might be required by the plain meaning of the phrase 'to arrange': 'to make plans, prepare.' " *Id.* Elsewhere, "contribute to" has been defined "to be an important factor in; help to cause." *Zands v. Nelson*, 779 F.Supp. 1254, 1264 (S.D.Cal.1991) (quoting *Random House Dictionary of the English Language* (2d ed. unabridged 1987)).

The plain meaning of "contribute to" is not to be considered in a vacuum. As *Aceto* explains, RCRA's "relevant legislative history supports a broad, rather than a narrow, construction of the phrase 'contributed to.' Although RCRA's contemporaneous legislative history is not very helpful ... subsequent reports which reviewed the statute after enactment expressly state that 'contributing to' is to be liberally construed." *Aceto*, 872 F.2d at 1383 (citing H.R.Rep. No. 96–IFC 31 at 31 (1979) (the Eckhardt Report); S.Rep. No. 96–172, at 5 (1980), *reprinted in* 1980 U.S.C.C.A.N. 5019, 5023); *accord United States v. Waste Indus., Inc.*, 734 F.2d 159, 167 (4th Cir. 1984). This is in keeping with the liberal construction accorded to RCRA in general because it is "a remedial statute." *Aceto*, 872 F.2d at 1383.

The establishment of a dumping ground by a municipality for the indiscriminate disposal of all types of solid waste by the general population could arguably constitute the municipality as an "arranger" since the municipality clearly thereby "assume[s] responsibility for determining [the waste's] fate." *General Elec.*, 962 F.2d at 286 (internal quotation omitted). Regardless, since "contribute to" would appear to constitute "less involvement than might be required by the plain meaning of the phrase 'to arrange,' " *Aceto*, 872 F.2d at 1384, RCRA liability should attach, especially in light of the requisite liberal construction to be accorded to the phrase and RCRA's underlying remedial purpose. To hold otherwise would mean in practical terms that no one could ever be responsible for contamination caused by such dumping since, given the indiscriminate, undocumented utilization of the dump by the general population over a protracted period of time, the contamination could never realistically be traced to particular contributors.

The cases relied upon by the Town do not support such a counter-intuitive proposition. In *Delaney*, the district court had to determine whether the Town of Carmel could be held strictly liable as an owner under CERCLA because it entered into leases with private landowners to allow septic waste haulers to dispose of such waste on the landowners' property. In answering this question in the negative, the court concluded that plaintiffs did not present "sufficient allegations of 'site control' to render the leaseholder Carmel a CERCLA 'owner.' " *Delaney*, 55 F.Supp.2d at 259; *but see Commander Oil*, 215 F.3d at 329 (holding that site control alone is an improper basis for imposition on lessees of owner liability under CERCLA). The court further rejected plaintiffs' alternative argument that the town should be held liable for arranging for the disposal of hazardous waste under the "arranger liability" prong of CERCLA because plaintiffs failed to establish that the town was "actively involved in the timing, manner, or location of disposal," or that it "had an obligation to control the septic waste haulers to whom it issued permits" to use the owners' premises. *Delaney*, 55 F.Supp.2d at 261. The court also considered whether the town could be liable under RCRA. In cryptic fashion, the court summarily concluded that "[t]he Town did not 'contrib-

ute' as construed under RCRA and, thus, is not liable." *Id.* at 262. In so ruling, the court apparently relied on the same lack of "active involvement" that precluded CERCLA arranger liability. As previously noted, this restrictive notion of arranging for the disposal of waste had been rejected by the Second Circuit in *General Electric*. Consequently, *Delaney* cannot be relied upon as giving appropriate consideration or content to the meaning of "contribute to" for purposes of RCRA liability. In any event, the limited involvement of the municipality in *Delaney* in respect to the disposal of septic waste contrasts sharply with the establishment by the Town, in the present case, of the open dump on its own property for the use of the general public.

The Town relies on *ABB Industries* for the proposition that the gradual underground spreading of contaminants, referred to as "passive migration," cannot be the basis for RCRA liability. Its reliance is misplaced since at issue in that case was simply whether a prior owner of property where passive migration was occurring, but who had not contributed to the spilling of hazardous chemicals which caused such migration, could nonetheless be held liable under either CERCLA or RCRA. In respect to CERCLA, the court held that "[i]f a person merely controlled a site on which hazardous chemicals have spread without that person's fault, that person is not a polluter and is not one upon whom CERCLA aims to impose liability." *ABB Indus.*, 120 F.3d at 358–59. As for RCRA, the

court simply pointed out that the defendants, as innocent owners, had no role to play whatsoever, unlike the present case, in contributing to the contamination of the site. *Id.* at 359.

The remaining issues, therefore, are whether the iron, ammonia and manganese in the leachate plume did indeed contaminate the pond and creek and, if so, whether such contamination presented an imminent and substantial endangerment to health or the environment.[26]

### 3. Has the Pond and Creek Been Contaminated by the Leachate Plume?

The Town argues that even though the leachate plume contaminated the groundwater, "[plaintiffs] have offered *no* evidence that any surface water has been exposed to the contaminant plume which is concentrated 30 to 55 feet below the ground in the Motts Pond area." Def.'s Post–Hearing Mem. at 11 (emphasis in original). To punctuate its argument the Town points to *Foster v. United States*, 922 F.Supp. 642 (D.D.C.1996), where the court concluded that since the contamination was essentially located at depths of ten-to-fifteen feet below ground and did not impact the surface or result in human exposure to soil contaminants through contacts, inhalation, or ingestion, such benign below-surface contamination could not be considered as causing an imminent and substantial endangerment to the site. *See id.* at 662; *see also Price v. United States Navy*, 39 F.3d 1011, 1019 (9th Cir.1994) ("endangerment must be substantial or

---

**26.** Having decided that the Town contributed to the disposal of solid waste at the dump, the Court need not consider the plaintiffs' additional contention—that the dump constituted the "storage" of solid waste. It would appear that RCRA's statutory definition of "storage" makes it "a term of art limited to interim measure[s] that therefore does not include the act of leaving waste with no intention of tak-

ing additional action." *South Road Assocs.*, 216 F.3d at 254 (internal quotations and citations omitted). It is thus unlikely that "storage" could be entailed. Moreover, plaintiffs have not offered any evidence, and seemingly do not contend, that the Town either handled, treated or transported the solid waste deposited in the dump.

serious, and there must be some necessity for the action").

Unlike the facts in *Foster,* the Court here has found that the leachate plume did indeed contaminate the surface. Dr. Ferrara, the Court's expert, provided the Court with the technical understanding of how the pond and creek were contaminated by the so-called sinking leachate plume, and reinforced Veraldi's testimony that there was no logical source other than the landfill for the contamination. The ultimate issue, therefore, is whether the contamination is sufficient to constitute the requisite hazard to health or the environment.

### 4. Does the Contamination of the Pond and Creek Present an Imminent and Substantial Endangerment to Health or the Environment?

■ Preliminarily, the Court notes, contrary to the Town's contention, that by providing in § 6972(a)(1)(B) that liability should attach to any "past or present" RCRA offender, Congress intended the statute to have retroactive application. *See Remington,* 989 F.2d at 1316 (unlike a citizen suit under § 6972(a)(1)(A), which has only prospective application, "[a]n imminent hazard citizen suit" under § 6972(a)(1)(B) "will lie against any 'past or present' RCRA offender"); *see also KFC W., Inc. v. Meghrig,* 49 F.3d 518, 520 n. 1 (9th Cir.1995), *rev'd on other grounds,* 516 U.S. 479, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996) ("§ 6972(a)(1)(B) applies both prospectively and retrospectively, to persons who contributed in the past to current endangerment").

Most notably, the Supreme Court in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Fdn., Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), has recognized the retrospective application of the statutory language in § 6972(a)(1)(B).

Congress has demonstrated ... that it knows how to avoid [the] prospective implication [of statutory language] by using language that *explicitly targets wholly past violations....* For example, the Solid Waste Disposal Act was amended in 1984 [by including § 6972(a)(1)(B) ] to authorize citizen suits against any 'past or present' generator, transporter, owner, or operator of a treatment, storage, or disposal facility 'who has contributed or who is contributing' to the 'past or present' handling, storage, treatment, transportation, or disposal of certain hazardous wastes.

484 U.S. at 57, n. 2, 108 S.Ct. 376 (emphasis added); *accord Ascon Props.,* 866 F.2d at 1159.

Thus, the courts that have specifically considered the issue have determined that the enactment dates of RCRA and its 1984 amendments are immaterial to liability under § 6972(a)(1)(B). *See, e.g., Tanglewood E. Homeowners v. Charles–Thomas, Inc.,* 849 F.2d 1568, 1575–76 (5th Cir.1988) (where waste was discarded before enactment date, court nonetheless "underst[ood] this language [of § 6972(a)(1)(B) ] to provide a claim for injunctive relief based on either past or present conduct"); *Aurora Nat'l Bank v. Tri Star Mktg., Inc.,* 990 F.Supp. 1020, 1032 (N.D.Ill.1998) (same); *Petropoulos v. Columbia Gas of Ohio, Inc.,* 840 F.Supp. 511, 515 (S.D.Ohio 1993) (same).

Consistent with the notion that (a)(1)(B) liability can attach to past or present violations, "the endangerment must be ongoing, but the conduct that created the endangerment need not be." *Remington,* 989 F.2d at 1316. An endangerment is ongoing "[a]s long as the waste has not been cleaned up and the environmental damage has not been sufficiently remedied." *Prisco v. New York,* 902 F.Supp. 374, 395 (S.D.N.Y.1995), *disagreed with on other*

*grounds, B.F. Goodrich v. Betkoski,* 99 F.3d 505 (2d Cir.1996), *cert. denied sub nom. Zollo Drum Co. v. B.F. Goodrich Co.,* 524 U.S. 926, 118 S.Ct. 2318, 141 L.Ed.2d 694 (1998); *see Nashua Corp. v. Norton Co.,* 116 F.Supp.2d 330, 356 (N.D.N.Y.2000) (Pooler, J.) ("imminent and substantial danger does not exist when the pollution at the site has been remedied or does not present a danger due to a barrier that prevents contaminants from escaping").

Because plaintiffs correctly concede that the contamination does not present any harm to human health, *see* Pls.' Post–Trial Mem. at 11, their § 6972(a)(1)(B) claim rests on whether it "may present" an ongoing imminent and substantial endangerment to the environment.

RCRA does not define "imminent and substantial endangerment" and the legal standard is "quite amorphous and open-ended." *United States v. Hooker Chems. & Plastics Corp.,* 749 F.2d 968, 988 (2d Cir.1984). While some courts have suggested that "an exceedingly low risk of harm or a risk of only minor harm will not support a [RCRA] action," *Davies v. National Coop. Refinery Ass'n,* 963 F.Supp. 990, 996 n. 2 (D.Kan.1997), the Second Circuit has adopted a broader reading of the statute, observing in *Dague* that the use of the word "may" to preface the "imminent and substantial endangerment" standard of liability "is 'expansive language', which is 'intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes.'" *Dague,* 935 F.2d at 1355 (*quoting United States v. Price,* 688 F.2d 204, 214 (3d Cir.1982)) (emphasis added by the court in *Dague*). Thus, "[a] finding of 'imminency' does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is

present." *Dague,* 935 F.2d at 1356; *see also Meghrig,* 516 U.S. at 486, 116 S.Ct. 1251 (quoting *Price v. United States Navy,* 39 F.3d at 1019). "Substantial," as the Town correctly observes, requires " 'reasonable cause for concern that someone or something may be exposed to risk or harm . . . if remedial action is not taken.' " Def.'s Post–Hearing Mem. at 19 (quoting *Foster,* 922 F.Supp. at 661 (internal quotation omitted)); *see also Raymond K. Hoxsie Real Estate Trust v. Exxon Educ. Fdn.,* 81 F.Supp.2d 359, 366 (D.R.I.2000) (same). " 'Endangerment' means a threatened or potential harm and does not require proof of actual harm." *Dague,* 935 F.2d at 1356.

Pertinent to environmental endangerment in the present case is that at least one substance that contaminates Motts Pond and Motts Creek, ammonia-N, is toxic to aquatic life. The plants, fish and other life forms that once inhabited these waters are gone. This harm is actual and a substantial endangerment to the environment. In itself it is sufficient to support RCRA liability under § 6972(a)(1)(B).

There is, however, an additional basis for such liability—one resting on aesthetic considerations. The pond and creek once were clear. Now, iron and manganese contamination has colored them a deep orange hue "unlike any" Tonjes, the Town's witness, had "ever seen elsewhere." Tr. at 549. The Town contends, without citation to any statutory or judicial authority, that "RCRA was not enacted to address the purely aesthetic impact which waste might have upon the environment." Def.'s Post–Hearing Mem. at 20. The Court agrees with the Town to the extent that the Court has not unearthed any cases substantively addressing the place of aesthetics in a RCRA § 6972(a)(1)(B) citizen suit. Nonetheless, there is a range of judicial precedents embracing aesthetic

considerations which appropriately inform the Court.

As previously noted, aesthetic injury provides a valid basis for standing under environmental suits generally, *see Sierra Club v. Morton,* 405 U.S. at 734, 92 S.Ct. 1361; *Laidlaw,* 528 U.S. at 183, 120 S.Ct. 693; *Defenders of Wildlife,* 504 U.S. at 563, 112 S.Ct. 2130, and for citizen suits under RCRA specifically, *see Caterpillar,* 30 F.Supp.2d at 1069; *Chemical Handling,* 778 F.Supp. at 25; *Environmental Compliance,* 1994 WL 695803, at *1. Apart from the place of aesthetics in the jurisdictional firmament, nearly half a century ago Justice Douglas observed in the context of land-use restrictions that it "is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." *Berman v. Parker,* 348 U.S. 26, 30–34, 75 S.Ct. 98, 102–03, 99 L.Ed. 27 (1954). "States and cities may enact land-use restrictions or controls to enhance the quality of life by preserving the character and desirable aesthetic features of a city." *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 129, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Thus, the Supreme Court held in *Penn Central Transportation Company* that landmark-preservation laws, based partly on aesthetics, are valid. *See id.* at 128–38, 98 S.Ct. 2646. Other land-use restrictions, such as local zoning laws, also may properly take aesthetics into account. *See Village of Belle Terre v. Boraas,* 416 U.S. 1, 9, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (it is "permissible" for zoning laws to promote aesthetic considerations); *Cellular Tel. Co. v. Town of Oyster Bay,* 166 F.3d 490, 495 (2d Cir.1999) ("[i]n New York, aesthetics can be a valid ground for local zoning decisions"); *see also Sprint Spectrum, L.P. v. Willoth,* 176 F.3d 630, 645 (2d Cir.1999) (holding in context of local environmental review process that "[a]esthetics is generally a valid subject of ... regulation and concern"); *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 357, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (discussing United States Forest Service regulations requiring special use permit authorization process to "minimize damage to scenic and esthetic values and fish and wildlife habitat"); *Good v. United States,* 189 F.3d 1355, 1362 (Fed.Cir.1999) (aesthetics one of the factors considered by the Army Corps of Engineers in issuing dredging or wetlands filling permits).

Aesthetics also have been recognized as relevant to First Amendment considerations. For instance, the Supreme Court has sanctioned limitations on political speech, in the form of posting of campaign signs on public property, because of aesthetics. *See Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 816–17, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (accepting city's "position that it may decide that the esthetic interest in avoiding 'visual clutter' justifies a removal of signs creating or increasing that clutter"). The Supreme Court also has permitted limitations on commercial speech for aesthetic reasons. *See Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 507–08, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) ("appearance of [a] city" is a "substantial governmental goal," accordingly "billboards ... can be perceived as an 'esthetic harm'"); *see also Lavey v. City of Two Rivers,* 171 F.3d 1110, 1114 (7th Cir.1999) (commercial speech); *Cleveland Area Bd. of Realtors v. City of Euclid,* 88 F.3d 382, 388 (6th Cir. 1996) (same).

There has perhaps been no keener observer of the particular aesthetic virtues possessed by ponds than Thoreau. As he said of Walden Pond almost a century-and-a-half ago:

Successive nations perchance have drank at, admired, and fathomed it, and passed away, and still its water is green and pellucid as ever. Not an intermitting spring! Perhaps on that spring morning when Adam and Eve were driven out of Eden Walden Pond was already in existence, and even then breaking up in a gentle spring rain accompanied with mist and a southerly wind, and covered with myriads of ducks and geese, which had not heard of the fall, when still such pure lakes sufficed them. Even then it had commenced to rise and fall, and had clarified its waters and colored them of the hue they now wear, and obtained a patent of Heaven to be the only Walden Pond in the world and distiller of celestial dews. Who knows in how many unremembered nations' literatures this has been the Castalian Fountain? or what nymphs presided over it in the Golden Age? It is a gem of the first water which Concord wears in her coronet.

Henry David Thoreau, *Walden and Other Writings of Henry David Thoreau* 162–63 (Modern Library 1937).

■ If the Town were to have its way, Motts Pond and Motts Creek would forever remain visual blights. This is unacceptable. The working-class residents comprising the Holtsville community surrounding the pond and creek should not be treated as if aesthetics are irrelevant to the quality of their lives.[27]

This litigation is an exemplar of Congress's wisdom in providing for citizen environmental endangerment lawsuits when the government falls to act. The Town's behavior is punctuated by its failure to respond meaningfully to the first consent order; its failure to timely respond to the second one; its failure to drill new wells to seek data from the groundwater by the pond and creek; its failure to fully investigate and test for possible other sources of contamination rather than simply to rely on conclusory assessments; its failure to assemble data to determine, as Tonjes stated, "what is going on;" its failure to allow committed professionals, such as Tonjes, to "do all that [he felt] professionally" necessary, and its suspect calculation of an HRS that fell barely below the score which would have warranted the designation of the landfill as a hazardous waste site.

## II. Clean Water Act

### A. Statutory Framework

Plaintiffs' Clean Water Act claim is predicated upon 33 U.S.C. § 1365(a)(1), which allows a citizen suit to be brought "against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in *violation of* (A) an effluent standard or limitation under this chapter." (Emphasis added). As previously noted, the Court has jurisdiction over the CWA claim, even though its delay provision would otherwise be applicable, because it is part of the hybrid complaint. *See Dague*, 935 F.2d at 1353–54.

The alleged CWA violation is that the Town discharged toxic and other pollutants into a navigable waterway from a point source without first obtaining a permit. *See* Compl. ¶¶ 43, 47 (referencing 33

---

27. *See* Bureau of the Census, U.S. Department of Commerce, *1990 Census of Population and Housing, Summary Social, Economic, and Housing Characteristics, New York* 240, 255, 265 (1992) (for a comparison of median family incomes in the Town's communities). The Court takes judicial notice of these public records. *See Papasan*, 478 U.S. at 268 n. 1, 106 S.Ct. 2932; *Time Warner*, 937 F.2d at 774; *Gonzalez*, 442 F.2d at 708 n. 11.

U.S.C. §§ 1311, 1317 and 1342). The Court must consider three issues: (1) whether there has indeed been a discharge of a pollutant from a point source; (2) whether the discharge was; into navigable waters; (3) whether the Town, as a past polluter, can be held liable for the ongoing nature of the discharge.

### B. Application of Statute

#### 1. Has There Been A Discharge of a Pollutant From a Point Source?

■ Section 1362(12) of the CWA defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." *See* 33 U.S.C. § 1362(12); *Concerned Area Residents for Env't v. Southview Farm*, 34 F.3d 114, 117 (2d Cir.1994) (quoting same), *cert. denied*, 514 U.S. 1082, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995). Plaintiffs allege in their complaint discharges from two point sources—"[t]he Landfill itself" and "Mott's Creek." Compl. ¶ 46. A "point source" is defined under the CWA as

> any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

33 U.S.C. § 1362(14). This definition is to be broadly interpreted. *See Concerned Area Residents*, 34 F.3d at 118–19.

In considering the CWA claim in *Dague*, the Second Circuit had to determine whether a particular stone railroad culvert was a point source. There the landfill was bordered by a pond, which was part of a marshy area. The court stated, without explanation, that they both were "considered navigable waters for purposes of the CWA." *Dague*, 935 F.2d at 1354. Contaminants leached from the landfill through groundwater into the pond, which "were then conveyed into the rest of the [marsh]" by the railroad culvert. *Id.* at 1355. The court held that even though "any pollutants in water flowing through the culvert ha[d] already entered waters of the United States before they flow[ed] through the culvert," the culvert "was a point source" under the CWA. *Id.* at 1354–55. In so holding, the court rejected the defendant's argument that "pollutants would be added only when they are introduced into navigable waters for the first time," *id.* at 1354, noting that "'discharge of a pollutant' refers to 'any point source' without limitation." *Id.* at 1355.

Given this broad reach, the culverts in the present case qualify as point sources.[28] Although the plaintiffs in their complaint only allege that "[t]he Landfill itself and Mott's Creek" are point sources, a contention which is not pressed in their submissions, and appears unsupportable,[29] the

**28.** The Town does not contend that it did not know of the existence of the culverts. *See Dague,* 935 F.2d at 1355 (noting in commenting on the holding in *United States v. Velsicol Chem. Corp.,* 438 F.Supp. 945, 947 (W.D.Tenn.1976), that the court there "found that the defendant knew or should have known that the city sewers led directly into the Mississippi River and this was sufficient to satisfy the CWA requirements"). In any event, regarding the culvert which the Court observed, it was prominently located under Woodside Avenue, and, therefore, it can fairly be presumed that the Town had to be aware of its existence.

**29.** The Second Circuit has noted that "[a]lthough by its terms the definition of 'point source' is nonexclusive, the words used to define the term and the examples given ('pipe, ditch, channel, tunnel, conduit, well, discrete fissure', etc.) evoke images of physical structures and instrumentalities that systematically act as a means of conveying pollutants from

Court will deem the complaint to be amended to conform to the proof. *See* Fed.R.Civ.P. 15(b); *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir.2000) (Rule 15(b) "permits a district court to amend pleadings after trial to conform to the evidence produced at trial" in the absence of prejudice to the party against whom the amendment is offered); *New York State Elec. & Gas Corp. v. Secretary of Labor*, 88 F.3d 98, 104–05 (2d Cir.1996) (approving of such amendments when made *sua sponte* and noting that Rule 15(b) requires no formal motion).

## 2. Was the Discharge into Navigable Waters?

■ "Navigable" is classically defined as "[a]dmitting of being navigated, affording passage for ships or boats." *Oxford English Dictionary*, vol. X, at 258 (2d ed.1989). For purposes of the CWA, it is defined as "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). Governing regulations promulgated by the EPA define such waters as including all "interstate waters," 40 C.F.R. § 122.2, and all "intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, 'wetlands,' sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce." *Id.; see United States v. TGR Corp.*, 171 F.3d 762, 764 (2d Cir.1999). Recognizing that "waters of the United States" is very broadly defined, the Second Circuit in *TGR Corp.* explicitly held that "non-navigable tributaries of navigable waterways qualify as 'waters of the United States.'"

*Id.* at 764–65 (citing, *inter alia, United States v. Eidson*, 108 F.3d 1336, 1341–42 (11th Cir.)) (human-made tributary comes under the CWA), *cert. denied,* 522 U.S. 899, 118 S.Ct. 248, 139 L.Ed.2d 177 (1997); *United States v. Texas Pipe Line Co.*, 611 F.2d 345, 347 (10th Cir.1979) (small unnamed tributary comes under the CWA); *United States v. Ashland Oil & Transp. Co.*, 504 F.2d 1317, 1325 (6th Cir.1974) (unnamed tributary flowing through three waterways before reaching a navigable river comes under the CWA).

Thus, even should the pond and creek be considered non-navigable in the classical sense, which according to the testimony of those who described the usage of these waters seemingly was not the case, they nonetheless were at least non-navigable tributaries of navigable waters, and therefore waters of the United States under the CWA. As both the Phase I and Phase II reports recognize, the pond and creek are tributaries of Canaan Lake. *See* Ex. 27 at 4–6 ("[t]he closest surface water downgradient of the Holtsville Landfill is an unnamed tributary of [C]anaan Lake"); Ex. 33 at 3–20 ("[t]he most prominent surface water feature in the study area is an unnamed creek which originates in the southeast corner of the former landfill, flows in a southeasterly direction and discharges into Canaan Lake"). Canaan Lake, in turn, flows into the Great South Bay, a classical interstate navigable body of water. *See* Tr. at 42, 50; *see also* U.S. Geological Survey, U.S. Dep't of Interior, Planimetric Maps, New York—Suffolk Co., Patchogue Quadrangle & Sayville Quadrangle (1975); Suffolk County Dep't of Planning, Existing Land Use Map (1962).[30]

---

an industrial source to navigable waterways." *United States v. Plaza Health Labs., Inc.*, 3 F.3d 643, 646 (2d Cir.1993). Notably, in *Dague,* the court's point source focus was on the culvert and not on the landfill or pond. *See*

*Dague,* 935 F.2d at 1354. Consequently, the landfill and creek in the present case do not appear to qualify as point sources.

30. The nature and usage of the pond and creek not only comport with the navigable

### 3. Can the Town, As a Past Polluter, Be Held Liable for the Ongoing Nature of the Discharge?

▮ In *Gwaltney*, the Supreme Court held that the statutory language "to be in violation" requires "either [a] continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney*, 484 U.S. at 57, 108 S.Ct. 376. Thus, unlike § 6972(a)(1)(B) of RCRA, the CWA does not permit citizen suits for "wholly past violations." *See id.* While the Supreme Court in *Gwaltney* "settled that 'wholly past' violations are not cognizable under the CWA's citizen suit provision, it offered little explanation as to when a violation ceases to be ongoing and becomes 'wholly past.'" *Wilson v. Amoco Corp.*, 33 F.Supp.2d 969, 975 (D.Wyo.1998). As explained in *Wilson*, the issue has divided the courts. On the one hand, "[s]ome courts have adopted an expansive interpretation and held that an ongoing violation exists until the risk of continued violation has been completely eradicated." *Wilson*, 33 F.Supp.2d at 975 (citing as an example for this proposition *Sierra Club v. Union Oil Co.*, 853 F.2d 667, 671 (9th Cir.1988)). *Wilson* points to two district court decisions which under this broad approach concluded "that a violation is ongoing when a pollutant previously added to groundwater continues to reach a navigable water via groundwater migration." *Id.* (citing *Umatilla Waterquality Protective Ass'n v. Smith Frozen Foods, Inc.*, 962 F.Supp. 1312, 1322 (D.Or.1997)); *Werlein v. United States*, 746 F.Supp. 887, 896–97 (D.Minn. 1990), *vacated in part on other grounds*, 793 F.Supp. 898 (1992). On the other hand, "[o]ther courts have not been so generous, and have held both pre- and post-*Gwaltney* that 'continuing residual effects resulting from a discharge are not equivalent to a continuing discharge.'" *Id.* (quoting *Hamker v. Diamond Shamrock Chem. Co.*, 756 F.2d 392, 397 (5th Cir. 1985)). *Wilson* references in that respect the Second Circuit's decision in *Remington* for its holding that "[t]he present violation requirement of the [CWA] would be completely undermined if a violation included the mere decomposition of pollutants." *Id.* (quoting *Remington*, 989 F.2d at 1313). It also points to a recent district court decision in its circuit specifically holding that "[m]igration of residual contamination resulting from previous releases is not an ongoing discharge within the meaning of the [CWA]." *Id.* (quoting *Friends of Santa Fe County v. LAC Minerals, Inc.*, 892 F.Supp. 1333, 1354 (D.N.M.1995)).

*Wilson* agreed with "the rationale expressed in *LAC Minerals* and other cases that migration of residual contamination from previous releases does not constitute an ongoing discharge, and that to so hold would undermine the CWA's limitations as set forth in the statute's definition of point source and the Supreme Court's holding in *Gwaltney*." *Id.* It also noted that "[n]umerous courts have held that only in rare circumstances will an ongoing CWA violation exist when the facilities from which

waters requirement under the CWA, but also would satisfy any Commerce Clause concerns under that statute, as well as under the application of RCRA, in the present case. *See TGR Corp.*, 171 F.3d at 764 (quoting *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 133, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) (holding that certain wetlands were included within the intendment of waters of the United States because of "the evident breadth of congressional concern for protection of water quality and aquatic ecosystems")); *compare Solid Waste Agency. of N. Cook County v. Army Corps of Engs.*, 531 U.S. 159, ——–——, 121 S.Ct. 675, 683–84, 148 L.Ed.2d 576 (2001) (administrative rule extending definition of "navigable waters" to intrastate waters used by migratory birds exceeded authority vested by Congress under the Commerce Clause).

the contaminants are emanating have themselves ceased operating." *Id.* (citing *Remington,* 989 F.2d at 1312–13).

The Court agrees with *Wilson,* and although *Remington* does not specifically address the *migration* of contaminants, as compared to its "mere decomposition," the Court believes that *Remington* conceptually supports the conclusion that the Town should not be held liable under CWA as a past polluter for the ongoing migrating leachate plume. There is no particular warrant for assessing CWA penalties against the Town for failing to obtain a permit in contemplation that the closed landfill at some future date might leak pollutants into navigable waters. It is RCRA, rather than the CWA, that appropriately addresses liability for ongoing contamination by past polluters. *See Hooker Chems.,* 749 F.2d at 979 (imminent and substantial endangerment under RCRA's citizen suit provision is not a valid basis to enforce a CWA citizen suit).

## CONCLUSION

Plaintiffs have established liability against the Town under 42 U.S.C. § 6972(a)(1)(B) for presenting an imminent and substantial endangerment to the environment (Count II). Their claim under 33 U.S.C. § 1365(a)(1)(A) is dismissed (Count III).

## CERTIFICATION PURSUANT TO 28 U.S.C. § 1292(b)

The remaining issue of remedies regarding the § 6972(a)(1)(B) claim, as well as the state law claims, render the order to be entered herein interlocutory and, ordinarily, nonappealable. *See* 28 U.S.C. § 1291 (courts of appeals only have jurisdiction to hear appeals from "final decisions of the district courts"); · *see also Forschner Group, Inc. v. Arrow Trading Co. Inc.,* 124 F.3d 402, 410 (2d Cir.1997) (where liability has been decided but dam-

ages remain undetermined, there is no final order). However, pursuant to 28 U.S.C. § 1292(b), "[a] court of appeals has discretion to review an interlocutory order in a civil case if the trial court states in writing that its order involves a controlling question of law about which there is substantial ground for difference of opinion and an immediate appeal may materially advance the ultimate termination of the litigation." *Koehler v. Bank of Bermuda Ltd.,* 101 F.3d 863, 864 (2d Cir.1996); *compare* Fed.R.Civ.P. 54(b) (permitting district court to direct entry of final judgment as to one or more but fewer than all claims in an action, thus allowing appeal of such claims under 28 U.S.C. § 1291). The Court so states.

The Court has resolved controlling issues of law about which it may fairly be said there is substantial ground for difference of opinion, such as, 1) whether the Court has subject matter jurisdiction under *Dague;* 2) whether the Town contributed to the disposal of solid waste within the meaning of "contribute to" under 42 U.S.C. § 6972(a)(1)(B); 3) whether aesthetic considerations may trigger liability under that statute, and 4) whether under the CWA the migration of the leachate plume may be the basis for liability against the Town as a past polluter.

Although these issues are significant, the Court notes that the *sine qua non* of § 1292(b) is to vindicate the goal of permitting interlocutory appeals where such an appeal "may avoid protracted litigation." *Koehler,* 101 F.3d at 865–66 (2d Cir.1996) (citing Note, *Interlocutory Appeals in the Federal Courts Under 28 U.S.C. § 1292(b),* 88 Harv.L.Rev. 607, 609–11 (1975) (drafters intended interlocutory appeal to "materially advance the termination of the litigation")). In making this assessment, the Court in *Koehler* recognized the "special ability of a trial court·

... to assess the efficiency of an immediate appeal." *Id.* at 866.

Given the history of this action, the remedy issues will undoubtedly entail extensive and costly litigation in a complex area of law. Moreover, should the Court of Appeals reject the plaintiffs' federal claims, there will be no need to adjudicate the numerous state law claims in light of the plaintiffs' stipulation that such claims would consequently be withdrawn. Unlike *Koehler*, the federal claims are meet for complete adjudication by the Court of Appeals.[31]

**SO ORDERED.**

---

**31.** Should any of the parties wish to pursue an appeal, the statute requires that an application now be made to the Court of Appeals "within ten days after the entry of the [district court's] order." 28 U.S.C. § 1292(b). Thereupon, "in its discretion," the Court of Appeals may "permit an appeal to be taken." *Id.; see also Koehler*, 101 F.3d at 866.

# ADDENDUM  A

LEGEND

● EXISTING MONITORING WELL (TOWN OF BROOKHAVEN)

○ PHASE II INVESTIGATION MONITORING WELL

(100) WELL DEPTH IN FEET  BELOW GROUND SURFACE

FORMER HOLTSVILLE LANDFILL
MONITORING WELL LOCATIONS

FIGURE NO. 3-1

ADDENDUM  B

